**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PELOTON INTERACTIVE, INC., SECURITIES LITIGATION. | Case No. 2:21-cv-02369-CBA-PK<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

TABLE OF DEFINED TERMS ...................................................................................... iii

I.    NATURE AND SUMMARY OF THE ACTION ............................................. 1

II.   JURISDICTION AND VENUE .................................................................... 6

III.  THE PARTIES............................................................................................. 7

IV.   BACKGROUND .......................................................................................... 8

      A.    Peloton's Tread+ and Tread Products........................................... 8

      B.    The Safety Events And Injuries Known to Defendants ............................ 13

      C.    Additional Risks Associated With The Use Of Peloton's Treadmills.................... 21

      D.    Peloton's System For Tracking and Analyzing The Member Experience ............. 23

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD CONCEALING THE SAFETY RISKS OF USING PELOTON'S TREAD+ AND TREAD ........................................................ 28

VI.   THE TRUTH BEGINS TO EMERGE ........................................................ 37

      A.    Peloton Announces A Child's Death Associated With The Tread+ But Continues To Mislead The Market ................................................. 37

      B.    The CPSC Publicly States That The Tread+ Is A Dangerous Product And Should Not Be Used And Peloton Continues To Mislead The Market ............... 39

VII.  THE TRUTH IS FINALLY REVEALED – PELOTON ADMITS ITS MISTAKE ....... 45

VIII. ADDITIONAL SCIENTER ALLEGATIONS.............................................. 49

      A.    *Respondeat Superior* and Agency Principles Apply................................. 49

      B.    Defendants Acted With Conscious Misbehavior Regarding The Safety Concerns Related To The Tread+ And The Tread.............................. 49

            1.    Peloton's Federal Safety Reporting Obligations....................................... 49

            2.    Safety Information Was Escalated Up The Chain To Peloton's Executives .................................................... 51

      C.    Defendants Were On Notice Of The Possibility Of A Recall ................................. 54

      D.    The Financial Gains Realized by Peloton's Executives and Directors.................... 57

E.    Defendants' Financial And Commercial Experience ................................................. 57

F.    The Importance Of The Tread+ And Tread To Peloton's Financial Success.......... 59

G.    SOX Certifications................................................................................................. 61

IX.    LOSS CAUSATION................................................................................................. 62

X.    CLASS ACTION ALLEGATIONS ......................................................................... 64

XI.    CONTROL PERSON LIABILITY........................................................................... 66

XII.    THE FRAUD ON THE MARKET PRESUMPTION ....................................... 67

XIII.    NO STATUTORY SAFE HARBOR.................................................................. 68

XIV.    CAUSES OF ACTION .......................................................................................... 69

XV.    PRAYER FOR RELIEF ......................................................................................... 72

XVI.    JURY TRIAL DEMAND ....................................................................................... 73

## TABLE OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | Period of time from September 11, 2020 through and including May 5, 2021 |
| CPSA | Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.* |
| CPSC | Consumer Product Safety Commission |
| CPSC Tread Recall Notice | The press release published by the CPSC on May 5, 2021 regarding the recall of the Tread. |
| CPSC Tread+ Recall Notice | The press release published by the CPSC on May 5, 2021 regarding the recall of the Tread+. |
| The Company | Peloton |
| Defendants | Peloton, Foley, Kushi, Olson, and Woodworth |
| Exchange Act | The Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* |
| Foley | John Foley, Peloton's Co-Founder and CEO |
| Individual Defendants | Foley, Kushi, Olson, and Woodworth |
| Kushi | Hisao Kushi, Peloton's Co-Founder and Chief Legal and Culture Officer |
| Olson | Brad Olson, Peloton's Chief Business Officer |
| Peloton | Peloton Interactive, Inc. |
| SEC | United States Securities and Exchange Commission |
| Woodworth | Jill Woodworth, Peloton's CFO |

The allegations in this Amended Class Action Complaint ("**Complaint**")[1] are based on the personal knowledge of Lead Plaintiff Richard Neswick ("**Lead Plaintiff**"), as to Lead Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Lead Plaintiff's information and belief is based upon the substantial investigation by Lead Plaintiff's counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of public filings referenced herein made by Peloton Interactive, Inc. ("**Peloton**" or the "**Company**") with the United States Securities and Exchange Commission ("**SEC**"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Peloton and Defendants named herein; (iii) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; and (iv) review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control. Lead Plaintiff believes that substantial additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This federal securities class action is brought on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Peloton between September 11, 2020 and May 5, 2021, inclusive (the "**Class Period**"). Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**") and Rule 10b-5 promulgated thereunder.

---

[1]    All internal citations and quotation marks are omitted and all emphases are added unless otherwise noted.

2.      Peloton describes itself as a technology, media, software, product-design, retail, apparel, and social connection company that enables its "community" to support one another.  In particular, the Company manufactures and markets stationary bicycles and treadmills that stream live and on-demand fitness classes to those devices through a touch screen included with the machines through a subscription service.  *See* Peloton Interactive, Inc., Annual Report (Form 10-K) 5 (Sept. 11, 2020).  Peloton's treadmills are called the Tread and Tread+.

3.      Defendants publicly touted the quality of Peloton's treadmills, the safety of the treadmill products, and the Company's commitment to safety for its customers using the treadmill products. However, Defendants knew that the truth about the Tread and Tread+ was far different than their public statements about these products. Peloton customers, and in some cases their children, were experiencing serious dangerous safety events and suffering injuries caused by Peloton's Tread and Tread+. Some of these injuries were brought to Peloton's attention by Peloton customers through the use of Peloton's members-only Facebook pages, however Defendants were aware that there were far more events and injuries. Despite their public statements assuring the market of the quality and safety of the Tread and Tread+, Defendants knew that their claims were not true, and that there were serious undisclosed safety issues with these products that were causing serious injuries to Peloton's customers using the products as well as their children and even pets who got too close to the tread of these products. Defendants knew the actual magnitude of the risks from the Tread and Tread+. Defendants invested substantial resources to monitor and track the injuries that were occurring due to the design of the Tread and Tread+.  For example, customers could report their injuries directly to Peloton.  As of May 5, 2021, Peloton had received 72 reports of adult users, children, pets, and/or objects being pulled under and trapped beneath the rear of the Tread+, including 29 reports of injuries to

children such as second- and third-degree abrasions, broken bones, and lacerations.  As well, in less than four months, Peloton received 107 incident reports of the Tread's screen loosening or detaching and falling, resulting in 3 injuries.

4.      Defendants were able to gather additional information about these events and injuries because customers posted about the events that were attributed to flaws with the Tread and Tread+ on Facebook pages monitored by Peloton.  Despite knowing the extent at which Peloton's customers and children were suffering serious and permanent injury due to flaws with the Tread and Tread+, Defendants concealed the extent of the risk of injury from the market and the risk of a recall of these products, and instead reassured Peloton's customers and the market about the safety of the Company's treadmill products by making  a series of false and misleading statements boasting that safety was a priority for Peloton and failing to properly warn of the substantial likelihood that the product contained dangerous design defects that would subject these products to a recall.  Meanwhile, in the absence of proper disclosures, Peloton's stock was trading at artificially high prices due to these false and misleading statements and omissions, the Individual Defendants were profiting handsomely, selling more than $405 million worth of their personal stock holdings.

5.      When a child was devastatingly killed under a Tread+ machine, the Individual Defendant, the co-founder and CEO of Peloton, Foley issued a public statement defending the Company's treadmill products and their safety, and then in his statement appeared to shift the responsibility for accidents and injuries suffered on Peloton products to the customers for failing to review and follow safety warnings and instructions.

6.      After this death occurred, the United States Consumer Product Safety Commission (the "**CPSC**") issued a public warning through a press release of the danger of

using the Tread+ due to safety issues and the serious risk of injury and described the incidents and injuries to children becoming entrapped, pinned and pulled under the rear of the product, and urged consumers with children and pets to stop using the Tread+ immediately.  The CPSC's press release went further and warned that the safety protocol provided by Peloton to its customers of locking the treadmill device when not in use may be insufficient because one incident occurred while a parent was running on a treadmill. The CPSC also reported on a pet and objects being sucked beneath a Tread+ suggesting a possible harm to the <u>user</u> if the <u>user</u> lost balance.

7.      Peloton promptly and publicly responded by continuing to falsely maintain that its treadmill products were safe when used in accordance with warnings and safety instructions and that there was no reason to stop using the Tread+ as long as all warnings and safety instructions were followed.  Foley even falsely accused the CPSC of making misleading and inaccurate statements in its press release regarding the risk of injury. Nevertheless, a day later, on April 18, 2021, Foley published a letter on Peloton's website and while he continued to defend Peloton's actions with the CPSC with false and/or misleading statements and/or omissions and committed to continuing to sell the Tread+, he effectively conceded risk and deficiencies by acknowledging that Peloton was working on a new software-enabled, safety system that would provide an additional layer of protection against death and disfigurement. *See Peloton Recalls Tread+ Treadmills After One Child Died and More than 70 Incidents Reported*, U.S. Consumer Product Safety Commission (May 5, 2021), https://www.cpsc.gov/Recalls/2021/Peloton-Recalls-Tread-Plus-Treadmills-After-One-Child-Died-and-More-than-70-Incidents-Reported ("**CPSC Tread+ Recall Notice**").  On this news, Peloton's stock price fell $16.28 per share, or 14% over the next three trading days.

8.      Less than one month later, on May 5, 2021, after engaging with the CPSC, Peloton not only stopped disputing the CPSC's prior statements but made an about face and acquiesced and agreed to a recall the Tread and Tread+. Foley issued his own statements about the recall:

> The decision to recall both products was the right thing to do for Peloton's Members and their families. ***I want to be clear, Peloton made a mistake in our initial response to the Consumer Product Safety Commission's request that we recall the Tread+. We should have engaged more productively with them from the outset. For that, I apologize.*** Today's announcement reflects our recognition that, by working closely with the CPSC, we can increase safety awareness for our Members. We believe strongly in the future of at-home connected fitness and are committed to work with the CPSC to set new industry safety standards for treadmills. We have a desire and a responsibility to be an industry leader in product safety. [sic]

*See* Press Release, CPSC, CPSC and Peloton Announce: Recall of Tread+ Treadmills After One Child Death and 70 Incidents; Recall of Tread Treadmills Due to Risk of Injury (May 5, 2021), https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-and-Peloton-Announce-Recall-of-Tread-Plus-Treadmills-After-One-Child-Death-and-70-Incidents-Recall-of-Tread-Treadmills-Due-to-Risk-of-Injury ("**Recall Press Release**").

9.      On May 5, 2021, both recalls were posted on the CPSC website: "Peloton Recalls Tread+ Treadmills After One Child Died and More than 70 Incidents Reported" and "Peloton Recalls Tread Treadmills Due to Risk of Injury[.]" https://www.cpsc.gov/Recalls/2021/Peloton-Recalls-Tread-Plus-Treadmills-After-One-Child-Died-and-More-than-70-Incidents-Reported and https://www.cpsc.gov/Recalls/2021/Peloton-Recalls-Tread-Treadmills-Due-to-Risk-of-Injury .

10.     This announcement caused Peloton's stock price to drop precipitously because the recall had a significant impact on the Company's reputation and revenues. On this news, Peloton's stock price fell $14.08 per share, or 14%, to close at $82.62 per share on May 5, 2021.

11.     Unfortunately, Peloton's customers, their children and pets were not the only individuals harmed by the Defendants' actions.  Lead Plaintiff and the other Class members also experienced significant losses as investors in a market that was build on the false statements Peloton had been making and their failure to disclose the actual ongoing safety issues and significant risks with Peloton's treadmills.  As a result, Lead Plaintiff has brought this class action on behalf of himself and other investors who have suffered as a result of Peloton's fraudulent acts.

## II.    JURISDICTION AND VENUE

12.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Peloton has numerous and extensive contacts within this district. Certain of the acts and conduct described herein, occurred in this District.

15.     Peloton maintains an extensive presence in the Eastern District.  Peloton has been selling both its products and in the Eastern District for a significant period of time.  In 2015, well before the start of the Class Period, Peloton opened a retail location in Manhasset, New York. *See* Harrison Marder, *Bicycle chain Peloton finds a home in Manhasset*, The Island Now (Oct. 22, 2015), https://theislandnow.com/news-98/bicycle-chain-peloton-finds-a-home-in-manhasset/. Then in October 2017, Peloton first opened a facility at the Roosevelt Field mall in Garden City, New York, which it expanded in 2019. *See* David Winzelberg, *Peloton expands at Roosevelt Field*, Long Island Bus. News (May 10, 2019), https://libn.com/2019/05/10/peloton-expands-at-

roosevelt-field/. Additionally, Peloton has continuously operated a warehouse in Syosset, New York for delivery across Long Island. *See Milvado Property Group Signs Peloton to 13,800-SF Lease in Syosset on Long Island*, Milvado.com (June 11, 2018), https://milvado.com/news/milvado-property-group-signs-peloton-13800-sf-lease-syosset-long-island/. Importantly, Peloton's stock transfer agent is also located in Brooklyn, New York. *See* Peloton Interactive, Inc., Form 424B (Sep. 26, 2019) at 141, available at https://investor.onepeloton.com/sec-filings/sec-filing/424b4/0001193125-19-255124.

16.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## III.    THE PARTIES

17.    Lead Plaintiff, Richard Neswick, purchased Peloton securities at artificially inflated prices during the Class Period and was damaged thereby when the truth was revealed, as set forth in the certification submitted to the Court. ECF No. 27-2.

18.    Defendant Peloton is a fitness technology company with its principal executive offices located at 441 Ninth Avenue, 6th Floor, New York, NY 10001. Peloton's stock transfer agent maintains its office within this district. Peloton's securities were traded on the NASDAQ Global Select Market, under the ticker symbol "PTON."

19.    Defendant John Foley ("**Foley**") is a co-founder of Peloton and has served as the Company's Chief Executive Officer ("**CEO**") since 2012. During the Class Period, Foley sold $76,814,965.79 in Peloton stock.

20.    Defendant Jill Woodworth ("**Woodworth**") has served as Peloton's Chief Financial Officer ("**CFO**") since April 2018.  During the Class Period, Woodworth sold $22,970,266.19 in Peloton stock.

21.    Defendant Hisao Kushi ("**Kushi**") is a co-founder of Peloton and has served as the Company's Chief Legal and Culture Officer since June 2015.  During the Class Period, Kushi sold $52,223,767.54 in Peloton stock.

22.    Defendant Brad Olson ("**Olson**") has served as Peloton's Chief Business Officer since August 2021.  Prior to filling that role, Olson served as Peloton's Senior Vice President of Member Experience from May 2016 to April 2020 and Chief Membership Officer from April 2020 to August 2021.

23.    Defendants Foley, Woodworth, Kushi, and Olson are collectively referred to herein as the "**Individual Defendants**" and together with Peloton, as the "**Defendants**."

## IV.    BACKGROUND

### A.    Peloton's Tread+ and Tread Products

24.    Peloton is a technology-enabled fitness company that manufactures and sells fitness machines with touchscreens on which a user can stream Peloton's instructor-led boutique classes while using the machine.  Peloton Interactive, Inc., Prospectus (Form 424(b)(4)) 1 (Sept. 26, 2019) ("**2019 Prospectus**"), https://www.sec.gov/Archives/edgar/data/1639825/000119312519255124/d738839d424b4.htm. During the Class Period, the Company sold four fitness machines: the Bike, the Bike+, the Tread, and the Tread+.  Peloton Interactive, Inc., Prospectus (Form 424(b)(5)) S-1 (Nov. 16, 2021).  Peloton's workout classes are available for Peloton members to stream live and on-demand via its subscription-based platform, the Peloton App, on Peloton equipment or through a phone, tablet, or television.  Peloton Classes, One Peloton, https://www.onepeloton.com/classes

(last visited Jan. 21, 2022),

https://www.sec.gov/Archives/edgar/data/1639825/000119312521330756/d263541d424b5.htm.

On the Peloton App, each member has an individual profile and, in addition to streaming fitness

classes, members can, *inter alia*, connect with one another, track their fitness goals, and

participate in training programs.  *See* Peloton – at home fitness, Apple Store,

https://apps.apple.com/us/app/peloton-at-home-fitness/id792750948 (last visited Jan. 21, 2022).

25.    Peloton began selling the Tread+ treadmill, model number TR01, solely in the

United States in 2018 for a premium price of $4,295.[2]  The Tread+ has a unique design.  Rather

than the traditional continuous nylon belt, the running belt on the Tread+ is made up of 59

individually-mounted aluminum slats that are coated with rubber and roll on a system of ball

bearings.  *See* Brenda Stolyar, *Peloton Tread+ Preview*, PC Magazine, Nov. 2018,

https://www.pcmag.com/reviews/peloton-tread-plus.  Slat-belt treadmills are designed to better

absorb shock from the runner, therefore providing a smoother run.  *See Slat Belt Treadmill vs*

*Regular Belt - What's the Difference*, Treadmill Reviews (Aug. 28, 2020),

https://www.treadmillreviews.com/blog/slat-belt-treadmill-vs-regular-belt/.  To accommodate

the slat-belt, the Tread+ has a very large, sturdy frame with an extra-long running surface.  The

Tread+ measures 72.5 inches long, 36.5 inches wide, and 72.0 inches high and, without the

incline raised, a runner is elevated 11.5 inches above the ground.  *See* Brenda Stolyar, *Peloton*

*Tread+ Preview*, PC Magazine, Nov. 2018, https://www.pcmag.com/reviews/peloton-tread-plus.

Due to the large size, the Tread+ weighs a whopping 455 pounds.  *See id.*  The Tread+ also

---

[2]    The treadmill, model number TR01, was originally launched with the name "Tread" in 2018 and later renamed to "Tread+" in September 2020.  *See* CPSC Tread+ Recall Notice.

features a 32-inch touchscreen on which users can stream Peloton's on-demand running classes. *See id.* A picture of the Tread+ is included below:



*See id.*

26.     Due to its design, the Tread+'s rear roller on the back of the belt is completely exposed, without any rear guard or safety bar. Rear guards and safety bars are featured on many other treadmills intended for at-home use. For example, the two pictures below show treadmills sold by competitor brands, Precor and NordicTrack, that have either a plastic guard or a safety bar on the end of the belts on the treadmills:

10



TRM 400 Line, Precor, https://precorathome.com/products/trm-400-line (last visited on Jan. 21, 2022).



Commercial 2950, NordicTrack, https://www.nordictrack.com/treadmills/commercial-2950-treadmill (last visited Jan. 3, 2022).  These rear guards and safety bars are meant to prevent items and people from being sucked under the treadmill by the belt.  *See* Chris Stokel-Walker, *A $4 bit of plastic could have saved Peloton millions*, Wired, May 12, 2021, https://www.wired.co.uk/article/peloton-treadmill-recall-design.  The one safety feature available

on the Tread+ is a magnetic safety key that, when pulled out of the Tread+ console, immediately stops the belt. *See* Chris Davies, *The US recalls agency is investigating Peloton's treadmill after a child death*, Slash Gear (Mar. 19, 2021), https://www.slashgear.com/the-us-recalls-agency-is-investigating-pelotons-treadmill-after-a-child-death-19664549/.

27.     In response to the spike in demand for Peloton's at-home fitness machines during the COVID-19 pandemic, in December 2020, Peloton released a more compact, affordable treadmill option called the Tread, model number TR02. *See* Chris L., *Lower-Cost Peloton Tread on Sale In UK*, Pelo Buddy, Dec. 26, 2020, https://www.pelobuddy.com/lower-cost-peloton-tread-onsale-in-uk/.  The Tread was initially only available for sale in the United Kingdom and Canada and on limited release in the United States. *See id.*

28.     The Tread differs from the Tread+ in several material ways.  First, it is much smaller, weighing 290 pounds and measuring 68 inches long, 33 inches wide, and 62 inches high. *See* Angela Moscaritolo, *Peloton Tread Review*, PC Magazine, Oct. 4, 2021, https://www.pcmag.com/reviews/peloton-tread.  The touchscreen is also more compact, measuring 23.8 inches.  Another significant difference is the design of the running belt. *See id.* On the Tread, the belt is a continuous loop made of nylon, as opposed to the slat design on the Tread+. *Id.*  Therefore, the base of the Tread is closer to the ground and has a safety bar. *Id.* The Tread is also more affordable, costing $2,495.  A picture of the Tread is featured below:



Tread, One Peloton, https://www.onepeloton.com/tread (last visited Jan. 21, 2022).

29.     The Tread+ and Tread machines were popular among consumers.  As of May 2021, approximately 125,000 Tread+ units and 6,500 Tread units had been sold.  *See* CPSC Tread+ Recall Announcement; Peloton Recalls Tread Treadmills Due to Risk of Injury, U.S. Consumer Product Safety Commission (May 5, 2021), https://www.cpsc.gov/Recalls/2021/Peloton-Recalls-Tread-Treadmills-Due-to-Risk-of-Injury ("**CPSC Tread Recall Notice**").

### B.      The Safety Events And Injuries Known to Defendants

30.     As of May 2021, Peloton had received 72 reports of adult users, children, pets, and/or objects becoming entrapped, pinned, and pulled under the rear roller of the treadmill.  *See* CPSC Tread+ Recall Notice.  More specifically, due to the height of the belt, the strength of the motor, and the exposed roller on the back of the belt, objects such as exercise balls, foam rollers, robot vacuums, and even a tricycle, were being sucked up under the rear roller of the Tread+, lifting the back of the base off the ground into the air, and in some cases, causing the runner to fall off the treadmill.  Of much greater concern, small pets and children were also being sucked

13

up under the real roller of the Tread+, getting trapped underneath the machine and experiencing serious injuries, including death.

31.     A timeline listing 107 safety events and injuries of this nature is attached hereto as Exhibit A.  Exhibit A shows that approximately 41 of the events related to exercise balls, 10 events related to foam rollers, 24 events related to robot vacuums, 25 events related to children, and 2 events related to pets.  At least 15 of the events were reported directly to Peloton and 81 were shared on members-only Peloton Facebook pages.

32.     One of the first events listed in the timeline occurred on or before January 1, 2019, when a woman named Brittany Pirozzolo wrote on Facebook's Official Peloton group page that while she was running on the Tread+, her Roomba robot vacuum was sucked up under her Tread+, and she said that she almost died:



*See* Ex. A.

33.    On April 24, 2019, a woman named Jessica Aspen wrote on Facebook's Peloton Tread group page that the prior Sunday, her husband was running on the Tread+ and an exercise ball was sucked underneath the back end of the machine.  They reported the incident to Peloton and the Company switched out the base.  *Id.*  In the comments section, a woman named Jessica James posted a picture of the Tread+ hoisted up on top of an excise ball writing, "one of my kiddos kicked an exercise ball towards the tread while I was running & it sucked it underneath!!":



34.    Violet Puma Kiggins wrote on Facebook's Peloton Tread group page that in November 2020 she was running on the Tread+ when her daughter accidentally kicked her foam roller behind the treadmill and the machine sucked up the foam roller, turning the Tread+ "into a

rolling tank." The incident frightened her and she notified Peloton regarding the "safety concern":







35.     Events of this nature became so common that the Peloton delivery employees began calling exercise balls the "ball of death[.]"  *Id.*  Former Peloton employee Steven Shleiwet commented on Facebook's Peloton Tread Group that he "had to fix a bunch" of Tread+ machines for balls that were sucked up underneath the base.  *Id.*

36.     However, far more serious events involving children and pets were also occurring.  As of May 2021, Peloton had received a total of 29 reports of injuries to children such as second- and third-degree abrasions, broken bones, and lacerations.  *See* CPSC Tread+ Recall Notice.  For example, on June 12, 2020, Sandra Rose wrote on the official Facebook Peloton Mom group that her six-and-a-half-year-old son was running on the Tread+ when he fell and became trapped underneath the running belt causing burns on his face and stomach.  She had

to enlist her husband to lift the Tread+ off their son.  In the comments, Stephanie Mahlmann

wrote that the same thing happened to her eight-year-old and "it was absolutely horrible."

Jordan Sullivan also commented that her friend's five-year-old was sucked up under the Tread+

and suffered "severe burns on her face, and hands and has to wear burn gloves for a year due to

it.":





37.    On November 16, 2019, 13-year-old Zoe Harake was sitting behind the Tread+ when her left leg was dragged under and trapped beneath the machine, resulting in permanent, disfiguring third degree burns to her body.  *See* Ex. 1 to Peloton Interactive, Inc.'s Not. of Removal, ECF No. 1 ¶¶ 1, 7, *Z. I. H. v. Peloton Interactive, Inc., et al.*, No. 8:21-cv-01217-DOC-DFM (C.D. Cal. July 16, 2021).  In March 2020, 3-year-old Sidney Stern was sucked up under the Tread+ while it was in use by his father.  Sidney's parents were able to pull him out from under the machine, but he suffered contusions to his arms, torso, and stomach.  *See* Ex. A to Peloton Interactive, Inc.'s Not. of Removal, ECF No. 1 ¶¶ 1, 2, 10, *S.S., et al. v. Peloton Interactive, Inc., et al.*, No. 3:21-cv-01367-BEN-DEB (S.D. Cal. July 29, 2021).  On July 5, 2020, a three-year-old child with the initials S.S. became trapped under the Tread+, suffering third degree burns to large parts of his body.  *See* Complaint, NYSCEF No. 1, *S.S., et al. v. Peloton Interactive, Inc.*, Index No. 516118/2021 (N.Y. Sup. Ct. July 1, 2021).  In November 2020, a 6-year-old boy with the initials R.G. was dragged by his clothing under the Peloton Tread+, suffering burns to his face and shoulder and scarring to his face.  *See* Complaint, ECF No. 1 ¶¶ 32-33, *Greene, et al. v. Peloton Interactive Inc.*, No. 4:21-cv-00215-MW-MAF (N.D. Fla. May 25, 2021).  These four incidents all resulted in personal injury actions against Peloton.

38.     As well, on November 12, 2020, a two-and-a-half-year-old child was pulled underneath the Tread+ and dragged to the front of the unit when his mother was running on it. Incident Report No. 20210319-E6F4C-3129396, CPSC, June 3, 2021, https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3129396.  The child was taken to the emergency room and suffered a hematoma on his head and track marks on his back.  *Id.* When the family notified Peloton of the incident, they only received an email response that advised them of the warnings on the machine.  *Id.*  On February 3, 2021, a three-year-old boy was found by his father trapped under the Tread+ without a pulse and not breathing.  He was resuscitated but suffered a serious brain injury and a neck injury.  Incident Report No. 20210213-97C35-2147365910, CPSC, Feb. 3, 2021, https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3054628.

39.     Small pets were also injured by the Tread+.  On October 29, 2020, a young cat was sucked up underneath the Tread+ when its owner was running on the machine. u/introvertical303, *Watch your pets*, Reddit, (Nov. 1, 2020, 12:19 PM), https://www.reddit.com/r/pelotoncycle/comments/jm5z0h/watch_your_pets/.  The cat suffered multiple serious injuries and was rushed to the emergency veterinarian.  *See id.*  When the cat was dragged under the machine, he damaged the treads, as a result, the pet owner reported the incident to Peloton and received a replacement base.  *See id.*

40.     However, the most serious incident was announced on March 18, 2021, when Peloton informed customers that a six-year-old child died after being pulled underneath the rear of a Tread+.  Rachel Lerman, *Child dies after accident with Peloton treadmill*, The Washington Post, Mar. 18, 2021, *available at*

https://www.washingtonpost.com/technology/2021/03/18/peloton-treadmill-child-death/.

Peloton has not provided more information on this incident.

### C.    Additional Risks Associated With The Use Of Peloton's Treadmills

41.    Shortly after the Peloton Tread became available for sale in the United Kingdom and Canada and for limited release in the United States, users began experiencing safety events caused by the display screens.  More specifically, the screws holding the display screens to the unit were coming loose and falling off, causing the screens to dislodge and hit either the user or belt mid-run.  CPSC Tread Recall Notice.  As of May 2021, Peloton had received 107 reports of the screen either loosening or completely detaching and falling, resulting in injuries such as abrasions, minor cuts, and bruises: the Company received 83 incident reports in Canada, including 3 injuries, and 18 reports of the screen loosening and 6 reports of the screen detaching and falling in the United States.  *See id.*; Lindsay William-Ross, *Over 5,500 Peloton treadmills recalled in Canada due to safety hazard*, Vancouver Is Awesome (May 5, 2021), https://www.vancouverisawesome.com/local-news/over-5500-peloton-treadmills-recalled-in-canada-due-to-safety-hazard-3753121.  At this time, only approximately 6,500 Treads had been sold by the Company.  *See* CPSC Tread Recall Notice.

42.    For example, on March 9, 2021, Rebecca Gardiner of Ontario, Canada was running on her Tread when the display screen fell off mid-run and she had to jump over it in order to not fall off the treadmill.  *See Peloton Tread Screen Falls Off Mid-Workout, Peloton Says to Fix It Yourself*, DC Rainmaker, May 6, 2021, https://www.dcrainmaker.com/2021/05/peloton- treadmill-recall-ordeal.html.  A picture of the aftermath of the incident is below:



*Id.*

43.     Rebecca immediately called Peloton support, and after many phone calls, Peloton decided to simply send her a new screen and told her to install it herself.  *See id.*

44.     As well, on May 5, 2021, Reddit user "brittanyy_103" wrote that sometime in the past, the touchscreen of her Tread fell off twice when her husband was sprinting.  *See Peloton Recalling all Treads?*, Reddit, May 5, 2021, https://www.reddit.com/r/pelotoncycle/comments/n5gvpq/peloton_recalling_all_treads/.  She explained that she and her husband "[c]ontacted Peloton both times and second time [Peloton] replaced the screen. . . . The repair team said they attended a repair right before ours where the screen fell off and tore the tread belt."  *Id.*  Reddit user "lets_get_Messi10" also wrote on May 5, 2021 that "I am one of the 6 people whose screen fell off.  I was not injured but it was very shocking when it happened[.]"  *Id.*

**D.** **Peloton's System For Tracking and Analyzing The Member Experience**

45.    Defendants were aware of these safety events and injuries caused by the Tread+ and Tread due to the Company's internal system for tracking and monitoring the experiences of Peloton members.

46.    Peloton prides itself on being a technology-based membership company where the membership community can use Peloton's platform to connect and "grow stronger together" through Peloton's "immersive software[.]"  The Peloton Story, One Peloton, https://www.onepeloton.com/company (last visited Jan. 21, 2021).  Therefore, putting members first is one of Peloton's core values.  *Id.*  As Peloton's CEO Foley explained, "Since our founding, we've prided ourselves on being a 'Members First' organization. And an important part of having a 'Members First' focus is providing superior customer service, service that starts with the purchase process and extends all the way through delivery, setup and ongoing member support.  We obviously don't just sell bikes and treads. We have an ongoing service relationship that we hope will extend for many, many years."  Peloton Interactive, Inc., PTON FQ1 2021 Earnings Call (Nov. 5, 2020) (transcript on file with S&P Global Market Intelligence).

47.    Peloton claims that it is constantly collecting data from members to tailor its platform to meet their needs.  As Olson, Peloton's Chief Business Officer, has explained, "[w]e capture every single piece of Member feedback across all channels, and read it back to the entire organization on a regular basis to identify emerging trends and areas for improvement.  The voice of our Members informs everything we do, from developing new product features like 'Now Playing' and music playlist previews to creating entirely new products, like the Peloton Tread."  *See* Nicole Diamant, *5 Questions with Peloton's Brad Olson*, Interbrand Health, https://www.interbrandhealth.com/views/5-questions-pelotons-brad-olson/ (last visited Jan. 21, 2022).

48.     Peloton gathers information from its members in several ways.  First, Peloton's Member Support Team is responsible for working directly with Peloton members to answer questions and to resolve their issues, including the safety events and injuries caused by Peloton machines.  *See* Member Support Associate, Parallel Desk, https://paralleldesk.com/job-details/member-support-associate-plano?utm_campaign=google_jobs_apply&utm_source=google_jobs_apply&utm_medium=organic (last visited Jan. 21, 2022); *see Everyone Is Someone to Us: How Member Support Goes Far Together*, One Peloton (Aug. 10, 2021), https://www.onepeloton.com/press/articles/member-support-goes-far-together.  Peloton members can reach out to the Member Support Team through the live-chat option in the Peloton App, by calling the toll-free number provided in the App, or sending an email to the address provided in the App.  Also, according to Confidential Witness 1 ("**CW1**"), who served as a member of the sales training team at Peloton from 2019 to November 2020,[3] when an injury or safety event is reported to a salesperson through phone, email, or in-person, the sales person is trained to escalate that report to the Member Support team.

49.     Second, Peloton engages with members through social media.  Indeed, Olson explained that Peloton does "a lot of social listening[,] to capture what [Peloton] members and prospective members are saying about [Peloton] and asking on social [media][,]" SVP Member Experience at Peloton, With Brad Olson, *The Chief Customer Officer Human Duct Tape Show*, 21:15, https://podcasts.apple.com/ca/podcast/svp-member-experience-at-peloton-with-brad-

---

[3] During CW1's employment at Peloton, CW1 worked closely with Director of Sales Training, Cale Brock, who reported to Vice President of Sales, Jennifer Parker.  During CW1's time at Peloton, CW1 was involved in crafting training materials for sales representatives.  CW1 worked with the Product Design, Marketing, and Legal teams to develop the sales training information, which included safety information about the products sold by Peloton and how to address safety events.

olson-cb54/id1113056721?i=1000386218799 (last visited Jan. 21, 2022). Peloton monitors

social media through its employees called "Community Associates," who are tasked with the

responsibilities of (1) "[m]onitor[ing] Peloton's social channels" and "addressing any support-

related posts, comments, messages and taking appropriate follow-up actions"; (2) "[r]esolving

Support-related social posts, comments and messages" by working with Peloton internally and

following up with members; and (3) "[e]ngag[ing] with Members on Peloton's social media

accounts" to address any issues that have arisen. *See* Community Associate II, One Peloton,

https://boards.greenhouse.io/peloton/jobs/3669007?gh_src=839cb4b41us&s=LinkedIn&source=

LinkedIn (last visited Jan. 7, 2022); *see also* Delaney Spetnagel, LinkedIn,

https://www.linkedin.com/in/delaneyspetnagel (last visited Jan. 7, 2022). CW1 reiterated that

Peloton had a team of employees who were responsible for responding to any comments on

social media about injuries, and these individuals were also tasked with reaching out to members

to address any issues that were raised in their posts.

50.     In regard to Facebook specifically, Peloton "invested a full-time resource to help

moderate" its official Facebook group. Nicole Diamant, *5 Questions with Peloton's Brad Olson*,

Interbrand Health, https://www.interbrandhealth.com/views/5-questions-pelotons-brad-olson/

(last visited Jan. 21, 2022). Olson explained that many "personal stories" are written on

Peloton's Official Facebook page, and Peloton's team "monitors, tracks, and selectively"

responds to some of those stories. *See* Brad Olson, *Cultivating Emotional Loyalty*, True

Ventures, at 21:08 (June 21, 2017), https://trueventures.com/true-platform/university/cultivating-

emotional-loyalty. Therefore, Peloton was documenting the posts listed in Exhibit A which

include stories and images from members regarding the alarming safety events and injuries

caused by the Tread+ on the Company's official, sponsored members-only Facebook Peloton

group page, the Company's official, sponsored members-only Facebook Peloton Mom group page, and the unofficial members-only Facebook Peloton Tread Group page.

51.    Third, Peloton gathers information about customers from the Peloton App itself. When a member logs into his or her account to use a Peloton machine, Peloton is able to gather data from that member's account to determine, for example, the date and time that the member is exercising, the duration of the class the member chose, and whether the member stopped exercising for a period of time.  *See* SVP Member Experience at Peloton, With Brad Olson, *The Chief Customer Officer Human Duct Tape Show*, 21:50, https://podcasts.apple.com/ca/podcast/svp-member-experience-at-peloton-with-brad-olson-cb54/id1113056721?i=1000386218799 (last visited Jan. 21, 2022).  Indeed, the data Peloton receives is so specific, the Company is able to determine whether a member got off of the machine mid-workout to do something else, such as answer the door.  *Id.*  Peloton uses that data to develop its content to meet its members' needs and to reach out to and re-engage members who have stopped using the machine for a period of time.  *Id.*

52.    Both the Member Support team and the social media team fall under the umbrella of the "Member Experience" division at Peloton.  SVP Member Experience at Peloton, With Brad Olson, Customer Bliss, https://www.customerbliss.com/podcasts/svp-member-experience-at-peloton-with-brad-olson-cb54/ (last visited Jan. 21, 2022).  The Member Experience division is overseen by Olson, who served as the Chief Membership Officer during the Class Period.  *See* Brad Olson, LinkedIn, https://www.linkedin.com/in/bradleyjolson/ (last visited Jan. 21, 2022).

53.    Every month, the Member Experience division reviews the data and inquiries it receives from the Member Support Team and social media team to analyze why members are reaching out to the Company, with the goal of addressing the root causes of the issues that are

arising.  *See* SVP Member Experience at Peloton, With Brad Olson, *The Chief Customer Officer Human Duct Tape Show*, 19:56, https://podcasts.apple.com/ca/podcast/svp-member-experience-at-peloton-with-brad-olson-cb54/id1113056721?i=1000386218799 (last visited Jan. 21, 2022).  The Member Experience division then compiles the data into a monthly "Voice of the Member" report that it shares with the entire organization.  *See* Session 11 – Peloton – Evolving Customer Experience Through Dramatic Change, *Qualtrics XM Talks*, 2:50 (July 3, 2020), https://www.qualtrics.com/events/qualtrics-xm-talks-season-1/session-11-evolving-cx-dramatic-change/?ty=mktowr-thank-you&aliId=6894.  Peloton uses this report to track what the Company is hearing from its members and to inform the priorities of the rest of the business.  *See* Brad Olson, *Cultivating Emotional Loyalty*, True Ventures, 36:14 (June 12, 2017), https://trueventures.com/true-platform/university/cultivating-emotional-loyalty.  If there is a trending issue, the Member Experience team flags that issue in the report.  *Id.*  Given that the "entire company is aligned around responding to member feedback[,]" when the Member Experience division is notified of a specific ongoing issue, it works with the other divisions at Peloton to resolve the problem.  *Id.*; *SVP Member Experience at Peloton, With Brad Olson*, The Chief Customer Officer Human Duct Tape Show, 20:30, 38:00, https://podcasts.apple.com/ca/podcast/svp-member-experience-at-peloton-with-brad-olson-cb54/id1113056721?i=1000386218799 (last visited Jan. 21, 2022).  According to Olson, understanding why members were contacting Peloton, and addressing their concerns as a company is a core part of how Peloton operates.  *Id.* at 20:40.

54.    Thus, Defendants were well-aware of the risks associated with the use of its treadmill products, the safety events and injuries caused by the Tread+ and Tread through the Company's internal non-public data analytics, reports and inquiries submitted to the Company's

Member Support team, as well as posts made on social media.  Despite their knowledge of this material information about the severity of the injuries and magnitude of risks from using its treadmill products that was not fully known to the market, Defendants not only failed to disclose this information issues to the market, but also continuously reassured the market that the Peloton treadmill products were safe to use. Defendants did not acknowledge the severity of the risk until Peloton was forced to do so by the CPSC.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD CONCEALING THE SAFETY RISKS OF USING PELOTON'S TREAD+ AND TREAD

55.    During the Class Period, Defendants made materially false and/or misleading statements that concealed the actual risks of using the Tread+ and Tread devices.

56.    On September 11, 2020, Peloton filed an annual report for the year ended on June 30, 2020 on a Form 10-K with the SEC (the "**2020 Form 10-K**"), https://www.sec.gov/Archives/edgar/data/1639825/000163982520000122/0001639825-20-000122-index.htm.  The report was signed by John Foley and Jill Woodworth.  The risk factors section of the 2020 Form 10-K warned, in relevant part:

> Risks Related to Our Business
>
> ***Our products and services may be affected from time to time by design and manufacturing defects that could adversely affect our business and result in harm to our reputation.***
>
> ***We offer complex hardware and software products and services that can be affected by design and manufacturing defects.*** Sophisticated operating system software and applications, such as those offered by us, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may also exist in components and products that we source from third parties. ***Any such defects could make our products and services unsafe, create a risk of environmental or property damage and personal injury, and subject us to the hazards and uncertainties of product liability claims and related litigation.*** In addition, from time to time we may experience outages, service slowdowns, or errors that affect our fitness and wellness programming. ***As a result, our services may not perform as***

28

*anticipated and may not meet customer expectations. There can be no assurance that we will be able to detect and fix all issues and defects in the hardware, software, and services we offer. Failure to do so could result in widespread technical and performance issues affecting our products and services and could lead to claims against us. We maintain general liability insurance; however, design and manufacturing defects, and claims related thereto, may subject us to judgments or settlements that result in damages materially in excess of the limits of our insurance coverage. In addition, we may be exposed to recalls, product replacements or modifications, write-offs of inventory, property and equipment, or intangible assets, and significant warranty and other expenses such as litigation costs and regulatory fines*. If we cannot successfully defend any large claim, maintain our general liability insurance on acceptable terms, or maintain adequate coverage against potential claims, our financial results could be adversely impacted. *Further, quality problems could adversely affect the experience for users of our products and services, and result in harm to our reputation, loss of competitive advantage, poor market acceptance, reduced demand for our products and services, delay in new product and service introductions, and lost revenue.*

. . .

*From time to time, we may be subject to legal proceedings, regulatory disputes, and governmental inquiries that could cause us to incur significant expenses, divert our management's attention, and materially harm our business, financial condition, and operating results*.

*From time to time, we may be subject to claims, lawsuits, government investigations, and other proceedings involving products liability, competition and antitrust, intellectual property, privacy, consumer protection, securities, tax, labor and employment, commercial disputes, and other matters that could adversely affect our business operations and financial condition*. As we have grown, we have seen a rise in the number and significance of these disputes and inquiries. *Litigation and regulatory proceedings, and particularly the intellectual property infringement matters that we are currently facing or could face, may be protracted and expensive, and the results are difficult to predict*. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. *Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our products or services, make content unavailable, or require us to stop offering certain features, all of which could negatively affect our membership and revenue growth*. See . . . the section titled '—Legal Proceedings[.]' The results of litigation, investigations, claims, and regulatory proceedings cannot be predicted with

certainty, and determining reserves for pending litigation and other legal and regulatory matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, ***these matters, and the time and resources necessary to litigate or resolve them, could harm our business, financial condition, and operating results***.

2020 Form 10-K 17, 25.

57.    The risk factor warnings made by Defendants Peloton, Foley, and Woodworth in the 2020 Form 10-K in ¶ 56 above were false and/or misleading when made because Defendants failed to disclose the true extent of the risks facing Peloton's business because, by the date of this statement, numerous adult users, children, pets and/or objects had been pulled under the rear of the Tread+, and in some instances, suffered second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40, all of which increased the probability that, *inter alia*, Peloton's reputation may be harmed, market acceptance for Peloton's products may be reduced, or the Company may be subject to lost revenue, recalls, litigation, or government investigations.

58.    The 2020 Form 10-K continued on to discuss Peloton's Tread+, stating in relevant part:

> ***The Tread provides a one-of-a-kind experience for runners, strength trainers, and bootcamp enthusiasts***. Like our Bike, ***the Tread*** has a state-of-the-art touch screen that allows Members to stream live and on-demand classes and ***is designed for performance and comfort. The Tread features a shock-absorbing rubber-slat belt and ball bearing system, ideal for low-impact training,*** while pace and incline knobs allow for seamless adjustments. The 32" high-definition touchscreen features a 20-watt sound bar for an immersive experience both on and off the Tread. Currently our Tread is only available in the United States and sells for $4,295, which includes delivery and set up. We offer qualified customers a 24-month, 0% APR financing program, allowing them to purchase the Tread and pay in monthly installments of $179.00.

59.    The statements regarding the Tread+ made by Defendants Peloton, Foley, and Woodworth in the 2020 Form 10-K in ¶ 58 above were false and/or misleading when made because Defendants failed to disclose that, by this date, the slat-belt system on the Tread+ had

caused numerous adult users, children, pets and/or objects to be pulled under the rear of the Tread+, and in some instances, suffer second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40.

60.     On October 15 and 16, 2020, Defendant Peloton retained spokeswoman Amelise Lane to issue statements on its behalf. The statements were reprinted in the Business Insider and New York Times, which stated, in relevant part:

> "***There is no greater priority than the safety and well-being of Peloton Members***," Peloton spokeswoman Amelise Lane said in an email to Business Insider.

Allana Akhtar, *Peloton issued a recall affecting nearly 30,000 bikes after reports of pedal breakages and customer injuries*, Business Insider, Oct. 15, 2020, https://www.businessinsider.com/peloton-issues-recall-for-bike-pedals-after-reports-injuries-2020-10?r=US&IR=T.

> ***We take pride in providing the best equipment***, proprietary networked software, and world-class streaming digital fitness and wellness content ***that our members love***," [Amelise Lane] said in a statement. She added that the recall affected only customers using their out-of-warranty original pedals on the affected bikes sold.

Jenny Gross, *Peloton Recalls Pedals on Thousands of Bikes After Reports of Injury*, N.Y. Times, Oct. 16, 2020, https://www.nytimes.com/2020/10/16/business/peloton-pedal-recall.html.

61.     The statements by Amelisa Lane, on behalf of Defendant Peloton in ¶ 60 above were false and/or misleading when made because Defendants failed to disclose that, by this date, the slat-belt system on the Tread+ had caused numerous adult users, children, pets and/or objects to be pulled under the rear of the Tread+, and in some instances, suffer second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40.

62.    On November 6, 2020, Defendant Peloton filed a quarterly financial report for the quarter ended on September 30, 2020 on a Form 10-Q with the SEC.  The report was signed by John Foley and Jill Woodworth.  The risk factors section of the quarterly report warned, in relevant part:

Risks Related to Our Business

***Our products and services may be affected from time to time by design and manufacturing defects that could adversely affect our business and result in harm to our reputation.***

***We offer complex hardware and software products and services that can be affected by design and manufacturing defects.*** Sophisticated operating system software and applications, such as those offered by us, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may also exist in components and products that we source from third parties. ***Any such defects could make our products and services unsafe, create a risk of environmental or property damage and personal injury, and subject us to the hazards and uncertainties of product liability claims and related litigation.*** In addition, from time to time we may experience outages, service slowdowns, or errors that affect our fitness and wellness programming. ***As a result, our services may not perform as anticipated and may not meet customer expectations. There can be no assurance that we will be able to detect and fix all issues and defects in the hardware, software, and services we offer. Failure to do so could result in widespread technical and performance issues affecting our products and services and could lead to claims against us. We maintain general liability insurance; however, design and manufacturing defects, and claims related thereto, may subject us to judgments or settlements that result in damages materially in excess of the limits of our insurance coverage. In addition, we may be exposed to recalls, product replacements or modifications, write-offs of inventory, property and equipment, or intangible assets, and significant warranty and other expenses such as litigation costs and regulatory fines***. If we cannot successfully defend any large claim, maintain our general liability insurance on acceptable terms, or maintain adequate coverage against potential claims, our financial results could be adversely impacted. ***Further, quality problems could adversely affect the experience for users of our products and services, and result in harm to our reputation, loss of competitive advantage, poor market acceptance, reduced demand for our products and services, delay in new product and service introductions, and lost revenue.***

. . .

32

> ***From time to time, we may be subject to legal proceedings, regulatory disputes, and governmental inquiries that could cause us to incur significant expenses, divert our management's attention, and materially harm our business, financial condition, and operating results***.

> ***From time to time, we may be subject to claims, lawsuits, government investigations, and other proceedings involving products liability, competition and antitrust, intellectual property, privacy, consumer protection, securities, tax, labor and employment, commercial disputes, and other matters that could adversely affect our business operations and financial condition***. As we have grown, we have seen a rise in the number and significance of these disputes and inquiries. ***Litigation and regulatory proceedings, and particularly the intellectual property infringement matters that we are currently facing or could face, may be protracted and expensive, and the results are difficult to predict***. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. ***Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our products or services, make content unavailable, or require us to stop offering certain features, all of which could negatively affect our membership and revenue growth***. See . . . the section titled '—Legal Proceedings[.]' The results of litigation, investigations, claims, and regulatory proceedings cannot be predicted with certainty, and determining reserves for pending litigation and other legal and regulatory matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, ***these matters, and the time and resources necessary to litigate or resolve them, could harm our business, financial condition, and operating results***.

Peloton Interactive, Inc. Quarterly Financial Report (Form 10-Q) 42, 50-51 (Nov. 6, 2020),

https://www.sec.gov/ix?doc=/Archives/edgar/data/1639825/000163982520000175/pton-

20200930.htm ("2021 Q1 Form 10-Q").

      63.     The statements by Defendants Peloton, Foley, and Woodworth in ¶ 62 above were

false and/or misleading when made because Defendants failed to disclose the true extent of the

risks facing Peloton's business because, by the date of this statement, numerous adult users,

children, pets, and/or objects had been pulled under the rear of the Tread+, and in some

instances, suffered second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40, all of which increased the probability that, *inter alia*, Peloton's reputation may be harmed, market acceptance for Peloton's products may be reduced, or the Company may be subject to lost revenue, recalls, litigation, or government investigations. Yet, Defendants Peloton, Foley, and Woodworth failed to update these risk factor statements as required by 17 C.F.R. § 229.305(c).

64.    On February 5, 2021, Defendant Peloton filed a quarterly financial report for the quarter ended on December 31, 2020 on a Form 10-Q with the SEC. The report was signed by John Foley and Jill Woodworth. The risk factors section of the quarterly report warned, in relevant part:

> Other Risks Related to Our Connected Fitness Products and Members
>
> ***Our products and services may be affected from time to time by design and manufacturing defects that could adversely affect our business and result in harm to our reputation.***
>
> ***We offer complex hardware and software products and services that can be affected by design and manufacturing defects.*** Sophisticated operating system software and applications, such as those offered by us, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may also exist in components and products that we source from third parties. ***Any such defects could make our products and services unsafe, create a risk of environmental or property damage and personal injury, and subject us to the hazards and uncertainties of product liability claims and related litigation.*** In addition, from time to time we may experience outages, service slowdowns, or errors that affect our fitness and wellness programming. ***As a result, our services may not perform as anticipated and may not meet customer expectations. There can be no assurance that we will be able to detect and fix all issues and defects in the hardware, software, and services we offer. Failure to do so could result in widespread technical and performance issues affecting our products and services and could lead to claims against us. We maintain general liability insurance; however, design and manufacturing defects, and claims related thereto, may subject us to judgments or settlements that result in damages materially in excess of the limits of our insurance coverage. In addition, we may be exposed to recalls, product replacements or modifications, write-offs***

*of inventory, property and equipment, or intangible assets, and significant warranty and other expenses such as litigation costs and regulatory fines*. If we cannot successfully defend any large claim, maintain our general liability insurance on acceptable terms, or maintain adequate coverage against potential claims, our financial results could be adversely impacted. ***Further, quality problems could adversely affect the experience for users of our products and services, and result in harm to our reputation, loss of competitive advantage, poor market acceptance, reduced demand for our products and services, delay in new product and service introductions, and lost revenue.***

. . .

***From time to time, we may be subject to legal proceedings, regulatory disputes, and governmental inquiries that could cause us to incur significant expenses, divert our management's attention, and materially harm our business, financial condition, and operating results***.

***From time to time, we may be subject to claims, lawsuits, government investigations, and other proceedings involving products liability, competition and antitrust, intellectual property, privacy, consumer protection, securities, tax, labor and employment, commercial disputes, and other matters that could adversely affect our business operations and financial condition***. As we have grown, we have seen a rise in the number and significance of these disputes and inquiries. ***Litigation and regulatory proceedings, and particularly the intellectual property infringement matters that we are currently facing or could face, may be protracted and expensive, and the results are difficult to predict***. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. ***Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our products or services, make content unavailable, or require us to stop offering certain features, all of which could negatively affect our membership and revenue growth***. See . . . the section titled '—Legal Proceedings[.]' The results of litigation, investigations, claims, and regulatory proceedings cannot be predicted with certainty, and determining reserves for pending litigation and other legal and regulatory matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, ***these matters, and the time and resources necessary to litigate or resolve them, could harm our business, financial condition, and operating results***.

Peloton Interactive, Inc. Quarterly Report (Form 10-Q) 52-54 (Feb. 5, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/1639825/000163982521000022/pton-20201231.htm ("2021 Q2 Form 10-Q").

65.     The statements by Defendants Peloton, Foley, and Woodworth in ¶ 64 above were false and/or misleading when made because Defendants failed to disclose the true extent of the risks facing Peloton's business because, by the date of this statement, (1) numerous adult users, children, pets, and/or objects had been pulled under the rear of the Tread+, and in some instances, suffered second- and third-degree abrasions, broken bones, and lacerations (*see* Ex. A ¶¶ 30-40); and (2) the touchscreen on numerous Treads had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-45), all of which increased the probability that, *inter alia*, Peloton's reputation may be harmed, market acceptance for Peloton's products may be reduced, or the Company may be subject to lost revenue, recalls, litigation, or government investigations.  Yet, Defendants Peloton, Foley, and Woodworth failed to update these risk factor statements as required by 17 C.F.R. § 229.305(c).

66.     On February 24, 2021, Defendant Woodworth spoke at the KeyBanc Capital Markets' Emerging Technology Summit.  During the conference, Peloton and Woodworth stated, in relevant part:

> *In terms of mix, it's been really, first of all, terrific to see the response in the U.K. and now Canada with our new tread. And the reception and reviews have been phenomenal*.

67.     The statements by Defendants Peloton and Woodworth in ¶ 66 above were false and/or misleading when made because Defendants failed to disclose that the touchscreen on numerous Treads had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-44).

68.     On March 1, 2021, Defendant Woodworth spoke at the JMP Securities Technology Conference.  During the conference, Peloton and Woodworth discussed the launch of the Tread, stating, in part:

> [Woodworth]:  As you know, we decided to change our course a little bit with the launch, and that we've delayed it by a couple of months after looking at some of the trend, learnings from the U.K.  ***Clearly, it exceeded our expectations***. ***We did, as planned, launched Canada. And that market rollout is going very well***. ***So we wanted*** to make sure we have the inventories and the resources available in those markets ***to make sure that we're delivering on that member promise and making that experience as best as it can possibly be***. . . . But again, ***we're really excited about the early reviews of the new Tread***.

> [Analyst]: . . .  So you mentioned the U.K. success on the call, you mentioned it just now. Tell us, what was it in the success? So I think we've heard originally existing members drove a lot of the demand, but maybe that's now newer members. I'm curious if you can talk about just what do you deem as success or how do you define that. And then how newer subscribers may have come on because of the Tread, if that makes sense?

> [Woodworth]:  Yes. ***Well, success is the review of the product, right? So the early reviews are really positive***.

69.     The statements by Defendants Peloton and Woodworth in ¶ 68 above were false and/or misleading when made because Defendants failed to disclose that the touchscreen on numerous Treads had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-44).

## VI.     THE TRUTH BEGINS TO EMERGE

### A.     Peloton Announces A Child's Death Associated With The Tread+ But Continues To Mislead The Market

70.     On March 18, 2021, Defendant Peloton emailed and published on its website a letter from Foley to all Tread+ owners warning that a child had died after being pulled under the Tread+.  The letter stated, in relevant part:

> I'm reaching out to you today because I recently learned about a tragic accident involving a child and the Tread+, resulting in, unthinkably, a death, . . . While we are aware of only a small handful of incidents

37

involving the Tread+ where children have been hurt, each one is devastating to all of us at Peloton, and our hearts go out to the families involved.

Chris L., *Letter From Peloton CEO John Foley Regarding Accident & Death of Child on Peloton Tread+*, Pelo Buddy, Mar. 18, 2021, https://www.pelobuddy.com/peloton-ceo-letter-tread-death/.

71.    This announcement was alarming to investors as Peloton had not disclosed that the Tread+ was causing serious safety concerns and/or injuries such that there was a risk of death.  The Company's stock price, which closed at $107.79 the day prior, dropped more than 5% during intra-day trading, reaching a low of $101.67.  Seeking Alpha, an investor analysis website, headlined: "Peloton shares weaker amid safety concerns[.]"  Joshua Fineman, *Peloton shares weaker amid safety concerns*, Seeking Alpha (Mar. 18, 2021), https://seekingalpha.com/news/3674153-peloton-shares-weaker-amid-safety-concerns?utm_source=bloomberg&utm_medium=referral; *see also* Tomi Kilgore, *Peloton stock extends drop after CEO note citing fatal accident involving child and the Tread+*, Market Watch (Mar. 18, 2021), https://www.marketwatch.com/story/peloton-stock-extends-drop-after-ceo-note-citing-fatal-accident-involving-child-and-the-tread-2021-03-18?mod=moneyish.

72.    To assuage the public's concern and to prevent the stock price from dropping further, in the letter, Peloton and Foley re-iterated the Company's dedication to the safety of its members, stating, in relevant part:

> **We design and build all of our products with safety in mind. But in order to help ensure that you and your family members stay safe with Peloton products in your home, we need your help**. This is especially true during what I hope is the final stretch of the pandemic where everyone is still at home. To prevent accidents, please take care to review and follow all the safety warnings and instructions that we provide, and always:
> Keep children and pets away from Peloton exercise equipment at all times.
> Before you begin a workout, double check to make sure that the space

around your Peloton exercise equipment is clear. When you finish a workout on your Tread+, remove the safety key and store it out of reach of children and anyone else who should not be able to start the Tread+. *We are always looking for new ways to ensure that you have the best experience with our products, and we are currently assessing ways to reinforce our warnings about these critical safety precautions to hopefully prevent future accidents*.

Chris L., *Letter From Peloton CEO John Foley Regarding Accident & Death of Child on Peloton Tread+*, Pelo Buddy, Mar. 18, 2021, https://www.pelobuddy.com/peloton-ceo-letter-tread-death/.

73.    The statements by Defendants Peloton and Foley in ¶¶ 70-72 above were false and/or misleading when made because Defendants failed to disclose the full extent of the safety events and injuries associated with the Tread+ and Tread, because, as of this date, (1) at least 91 adult users, children, pets, and/or objects had been pulled under the rear of the Tread+, and in some instances, suffered second- and third-degree abrasions, broken bones, and lacerations (*see* Ex. A, ¶¶ 30-40); and (2) the touchscreen on numerous Treads had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-44).

74.    After Peloton notified the CPSC of the death associated with the Tread+, the agency began to investigate the safety events associated with the treadmill.  *See* Chris Davies, *The US US recalls agency is investigating Peloton's treadmill after a child death*, Slash Gear (Mar. 19, 2021), https://www.slashgear.com/the-us-recalls-agency-is-investigating-pelotons-treadmill-after-a-child-death-19664549/.

### B.    The CPSC Publicly States That The Tread+ Is A Dangerous Product And Should Not Be Used And Peloton Continues To Mislead The Market

75.    On April 17, 2021, the CPSC's investigation reached its conclusion and the agency issued a press release warning consumers to stop using the Peloton Tread+.  *See* Press Release, *CPSC Warns Consumers: Stop Using the Peloton Tread+*, CPSC (Apr. 17, 2021),

https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Warns-Consumers-Stop-Using-the-Peloton-Tread.  The press release stated, in relevant part:

> The U.S. Consumer Product Safety Commission (CPSC) is warning consumers about the danger of popular Peloton Tread+ exercise machine after multiple incidents of small children and a pet being injured beneath the machines. The Commission has found that the public health and safety requires this notice to warn the public quickly of the hazard. . . .
>
> To date, CPSC is aware of 39 incidents including one death. CPSC staff believes the Peloton Tread+ poses serious risks to children for abrasions, fractures, and death. In light of multiple reports of children becoming entrapped, pinned, and pulled under the rear roller of the product, CPSC urges consumers with children at home to stop using the product immediately. This video demonstrates the hazard to children posed by the Tread+. . . . It is believed that at least one incident occurred while a parent was running on the treadmill, suggesting that the hazard cannot be avoided simply by locking the device when not in use. Reports of a pet and objects being sucked beneath the Tread+ also suggest possible harm to the user if the user loses balance as a result.
>
> **What should consumers do now?**
>
> - Stop using the Peloton Tread+ if there are small children or pets at home. Incidents suggest that children may be seriously injured while the Tread+ is being used by an adult, not just when a child has unsupervised access to the machine.
>
> - If consumers must continue to use the product, CPSC urges consumers to use the product only in a locked room, to prevent access to children and pets while the treadmill is in use. Keep all objects, including exercise balls and other equipment, away from the treadmill. . . .

76.    The market was shocked by this news because the CPSC revealed that the safety concerns with the Tread+ extended far beyond the death of one child.

77.    When Peloton's stock resumed trading on April 19, 2021, it dropped 14.1% over the course of three trading days, falling from a close of $116.21 on April 16, 2021 to a close of $99.93 on April 21, 2021.  Indeed, Landon Luxembourg, an analyst at investment firm Third Bridge, warned that problems surrounding the Tread+ could make prospective consumers wary of purchasing Peloton's machines, stating that "[t]he safety component may now be much more

40

top-of-mind for consumers looking to invest in a treadmill and this warning may bring consumer scrutiny to the rest of Peloton's product offerings[.]"  Palash Ghosh, *Peloton Shares Drop After It Resists Regulator Warnings About Treadmill Following Child's Death*, Forbes (Apr. 19, 2021), https://www.forbes.com/sites/palashghosh/2021/04/19/peloton-shares-drop-after-it-resists-regulator-warnings-about-treadmill-following-childs-death/?sh=60b3a7c443d7.  As well, Bank of America cut its price target on Peloton shares from $170 to $150.  *Id.*

78.     Peloton came out on the defensive, issuing a press release on April 17, 2021 entitled, "***CPSC Publishes Misleading, Inaccurate Bulletin on Tread+ Product Safety***" that heavily refuted the CPSC's claims.  The press release was filed with the SEC as an Exhibit to a Form 8-K that was signed by Defendant Kushi.  In the press release Peloton stated, in relevant part:

> ***Peloton (NASDAQ: PTON) cares deeply about the safety of its Members and one of its core values is putting Members first. The company is troubled by the Consumer Product Safety Commission's (CPSC) unilateral press release about the Peloton Tread+ because it is inaccurate and misleading. There is no reason to stop using the Tread+, as long as all warnings and safety instructions are followed***. . . .

> Peloton was shocked and devastated to learn in March that a child died while using the Tread+. Within a day of learning this news, Peloton notified CPSC. While preparing its report to CPSC, Peloton learned through a doctor's report to CPSC's public database that a child had experienced a brain injury. Peloton spoke to the family who reported that and the child is expected to fully recover. Not wanting to delay in notifying Members, on March 18, 2021, Peloton's co-founder and CEO John Foley sent an urgent reminder directly to Tread+ Members to follow the critical warnings and safety instructions that accompany the Tread+, which state that children, pets, and objects should be kept clear of the Tread+ at all times. Members were also reminded to remove the Safety Key and store it out of the reach of children when an adult is not using the Tread+. ***As hoped, this message received widespread attention, further reinforcing this vital safety message***. . . .

> ***While Peloton knows that the Tread+ is safe for the home when used in accordance with warnings and safety instructions, the company is committed to taking whatever steps are necessary and appropriate to further inform Members***

*of potential risks and remind them of measures they need to take to safeguard themselves and others in their households. Peloton will also continue to work to develop industry-leading safety features for connected home exercise equipment.*

*Peloton invited CPSC to make a joint announcement about the danger of not following the warnings and safety instructions provided with the Tread+, and Foley asked to meet directly with CPSC. CPSC has unfairly characterized Peloton's efforts to collaborate and to correct inaccuracies in CPSC's press release as an attempt to delay. This could not be farther from the truth. The company already urged Members to follow all warnings and safety instructions. Peloton is disappointed that, despite its offers of collaboration, and despite the fact that the Tread+ complies with all applicable safety standards, CPSC was unwilling to engage in any meaningful discussions with Peloton before issuing its inaccurate and misleading press release.*

*Peloton remains open to working with CPSC to further ensure that Members are safe and have the opportunity to live healthier and fuller lives through the use of Peloton products.*

Peloton Interactive, Inc., Press Release (Ex. 99.1 to Form 8-K) (Apr. 17, 2021), https://www.sec.gov/Archives/edgar/data/1639825/000163982521000141/pelotonapril17.htm.

79.     The statements made by Defendants Peloton and Kushi in ¶¶ 77-78 above were false and/or misleading when made because Defendants failed to disclose:

- The full extent of the safety events and injuries associated with the Tread+, because, as of this date, at least 102 adult users, children, pets, and/or objects had been pulled under the rear of the Tread+, and in some instances, suffered second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40;

- That numerous safety events and injuries had also been caused by the Tread, whereby the touchscreens had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-44);

- That Peloton was not cooperating fully with the CPSC as the Company later admitted on May 5, 2021 (¶¶ 87, 94); and

- It was extremely likely that Peloton would recall the Tread+ and the Tread in light of the safety events and injuries associated with the machines (*see* Ex. A ¶¶ 85-89).

80.    On April 18, 2021, in response to the CPSC release, Defendant Foley wrote a

letter that was published on Peloton's website that stated in part:

> . . . I want to let you know what's happened in the past month. After we learned about the child's death, we immediately reported to the U.S. Consumer Product Safety Commission (CPSC). ***Since then we have fully cooperated with CPSC and responded to all of their requests, with one exception: we resisted their demands for personally identifiable information of certain Members because those Members had specifically requested that we not provide that information to CPSC. At no time was Peloton trying to impede CPSC's investigation.*** We were simply standing behind our Members' right to maintain their privacy, and we remain committed to providing this type of information only with a Member's consent or pursuant to a subpoena. Government agencies shouldn't have unfettered access to consumers' private information, and I am proud that we took a stand to protect these Members' privacy.
> …
>
> You may also have read news reports suggesting that CPSC believes that we should stop selling or recall the Tread+. I want to assure you that we have no intention of doing so. The Tread+ is safe when our warnings and safety instructions are followed, and we know that, every day, thousands of Members enjoy working out safely on their Tread+.
>
> …
>
> Finally, I'm proud to share that our Tread+ product team is working on a new ***software-enabled, backup access code that will provide an additional layer of protection against unwanted use of the Tread+***. We are working hard to roll this out soon! We will continue to look for new ways to maintain our goal of leading the industry in safety and Member experience.

One Peloton, *A Follow-up Note from Peloton CEO John Foley about Safety and the Peloton Tread+* (Apr. 18, 2021), https://www.onepeloton.com/press/articles/tread-plus-follow-up.

81.     On this news, Peloton's stock price fell $16.28 per share, or 14%, over the next three trading days to close at $99.93 per share on April 21, 2021, damaging investors.

82.     The statements made by Defendant Foley in ¶ 80 above were false and/or misleading when made because Defendants failed to disclose:

- The full extent of the safety events and injuries associated with the Tread+, because, as of this date, at least 106 adult users, children, pets, and/or objects had been pulled under the rear of the Tread+, and in some instances, suffered second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40;

- That numerous safety events and injuries had also been caused by the Tread, whereby the touchscreens had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-44); and

- That Peloton was not cooperating fully with the CPSC as the Company later admitted on May 5, 2021 (¶¶ 87, 94).

83.     On April 30, 2021, CNN published an article entitled "Peloton is rolling out Fans' most-requested features" which included portions of an interview CNN conducted with Brad Olson.  The article quoted Olson as stating, "***We obviously take our members' safety seriously***[.]" Jordan Valinsky, *Peloton is rolling out Fans' most-requested features*, CNN (Apr. 30, 2021), https://www.cnn.com/2021/04/30/business/peloton-homecoming-new-features/index.html.

84.     The statements made by Defendants Peloton and Olson in ¶ 83 above were false and/or misleading when made because Defendants failed to disclose:

- The full extent of the safety events and injuries associated with the Tread+, because, as of this date, at least 106 adult users, children, pets, and/or objects had been pulled under the rear of the Tread+, and in some instances, suffered second- and third-degree abrasions, broken bones, and lacerations, *see* Ex. A ¶¶ 30-40;

- That numerous safety events and injuries had also been caused by the Tread, whereby the touchscreens had loosened and detached and fallen, causing injuries such as abrasions, minor cuts, and bruises (*see* ¶¶ 41-44); and

- That Peloton was not cooperating fully with the CPSC as the Company later admitted on May 5, 2021 (¶¶ 87, 94)

## VII.  THE TRUTH IS FINALLY REVEALED – PELOTON ADMITS ITS MISTAKE

85.    After the market opened on May 5, 2021, the CPSC and Peloton issued a joint press release announcing the voluntary recall of all of the Tread+ and Tread machines on the market. *See* Recall Press Release.  Pursuant to the recall, consumers who purchased either treadmill were advised to immediately stop using it and contact Peloton for a full refund or other qualified remedy. *Id.*  For those customers who do not want a refund, Peloton offered the option of moving the Tread+ free of charge to a room where children or pets cannot access the treadmill, and is implementing software improvements to the product to automatically lock the Tread+ and assign a 4-digit passcode that will be required to unlock the Tread+.  CPSC Tread+ Recall Notice.

86.    The press release quoted Robert S. Adler, Acting Chairman of the CPSC, as stating:

> I am pleased that the U.S. Consumer Product Safety Commission and Peloton have come to an agreement to protect users of the Peloton Tread+ and Tread

products. The agreement, which the Commission voted this morning to accept, requires Peloton to immediately stop selling and distributing both the Tread+ and Tread products in the United States and refund the full purchase price to consumers who wish to return their treadmills. The agreement between CPSC and Peloton **is the result of weeks of intense negotiation and effort**, culminating in a cooperative agreement that I believe serves the best interests of Peloton and of consumers. I would like to thank the CPSC technical staff who have worked tirelessly to protect consumers and to warn the public. Today we have taken steps to prevent further harm from these two products.

Recall Press Release.

87.    The press release also included the following statement from Peloton CEO, John Foley, in which he conceded that the Company initial response was a mistake:

> The decision to recall both products was the right thing to do for Peloton's Members and their families. I want to be clear, **Peloton made a mistake in our initial response to the Consumer Product Safety Commission's request that we recall the Tread+. We should have engaged more productively with them from the outset**. For that, I apologize. Today's announcement reflects our recognition that, by working closely with the CPSC, we can increase safety awareness for our Members. We believe strongly in the future of at-home connected fitness and are committed to work with the CPSC to set new industry safety standards for treadmills. We have a desire and a responsibility to be an industry leader in product safety.

*Id.*

88.    The Tread+ Recall Notice published by the CPSC that day disclosed that Peloton had received 72 reports of adult users, children, pets and/or objects being pulled under the rear of the treadmill, including 29 reports of injuries to children such as second- and third-degree abrasions, broken bones, and lacerations. *See* CPSC Tread+ Recall Notice. In regard to the Tread, the Tread Recall Notice published that day stated that Peloton "is aware of 18 reports of the touchscreen loosening and six reports of the touchscreen detaching and falling." CPSC Tread Recall Notice.

89.    Health Canada also announced the recall of Peloton's Tread on May 5, 2021. Health Canada explained that the Tread posed a safety hazard because "[t]he screws attaching

the touchscreen console to the treadmill can come loose, causing it to detach and fall, posing a risk of injury to consumers."  Lindsay William-Ross, *Over 5,500 Peloton treadmills recalled in Canada due to safety hazard*, Vancouver Is Awesome (May 5, 2021), https://www.vancouverisawesome.com/local-news/over-5500-peloton-treadmills-recalled-in-canada-due-to-safety-hazard-3753121.  Health Canada disclosed that as of May 4, 2021, Peloton had received 83 incident reports in Canada, including 3 injuries, and 18 reports of the screen loosening and 6 reports of the screen detaching in the United States.  *Id.*

90.    At the time of the recalls, approximately 125,000 Tread+ machines had been sold in the United States, approximately 1,050 Tread machines had been sold in the United States, and approximately 5,400 Tread machines had been sold in Canada.  *See* CPSC Tread+ Recall Notice; CPSC Tread Recall Notice.

91.    On the news of the recalls, the price of Peloton's shares dropped $14.08, or approximately 14.6%, from a close of $96.70 on May 4, 2021, to a close of $82.62 on May 5, 2021.

92.    The market voiced their disappointment with this news.  KeyBanc analyst Edward Yruma said he sees the voluntary recall of Peloton's Tread and Tread+ as "a clear negative." *Peloton Tread, Tread+ recalls a 'clear negative,' says KeyBanc*, The Fly (May 5, 2021), https://thefly.com/n.php?id=3297114.  Bloomberg commentator Tara Lachapelle said that Peloton "blew it" noting that the recall "threatens to damage its brand and dent sales and profits[.]"  Tara Lachapelle, *Peloton Was Winning and Blew It* (May 5, 2021), https://www.bloomberg.com/opinion/articles/2021-05-05/peloton-was-winning-until-treadmill-recall-revealed-weaknesses.  Bank of America analyst Justin Post slashed his rating on Peloton's stock to Neutral from Buy and lowered the price target down to $100 from $150.  Brian Sozzi,

*Peloton treadmill recall causes Bank of America to slash rating on the stock*, Yahoo! News (May 5, 2021), https://news.yahoo.com/peloton-treadmill-recall-causes-bank-of-america-to-slash-rating-on-the-stock-211412427.html.  Post explained that, "[w]e think tread overhang will impact the Street's long-term subscriber growth outlook and, therefore, the stock's multiple[.]"  *Id.*

93.    Kaitlin Wowak, assistant professor of IT, analytics, and operations at the University of Notre Dame's Mendoza College of Business, who specializes in recalls, said Peloton's failure to immediately recall the treadmills was troubling.  *See* Bethany Biron, *Experts say Peloton will emerge from the treadmill recall with its bottom line intact — even as its delay in issuing a recall exposes larger safety issues*, Business Insider (May 6, 2021), https://www.businessinsider.com/pelotons-treadmill-recall-unlikely-to-hurt-the-company-long-term-2021-5/.  Wowak noted that "[w]hen federal agencies request that a company recall their product, they should do so."  *Id.*  Carl Tobias, Williams Chair in Law and a professor at the University of Richmond School of Law, said that in addition to endangering its consumers, the delay in issuing a recall may have lasting damage to Peloton's reputation.  *Id.*

94.    The following day, on May 6, 2021, Peloton held an earnings conference call to discuss its financial results for the third quarter of 2021.  On the call, Foley reiterated that "***Peloton made a mistake in our initial response to Consumer Product Safety Commission's request that we recall our Tread+ product.  We should have been more open to a productive dialogue with them from the outset***.  As a Members First organization promptly stopping the sales of our products while we cooperated more closely with the CPSC was something we should have considered sooner. For that, I apologize."  Peloton Interactive, Inc., FQ3 2021 Earnings Call (May 6, 2021) (transcript available from S&P Global Market Intelligence).  Woodworth

48

estimated that "the revenue impact of the Tread and Tread +Plus recall will be approximately *$165 million*." *Id.*

95.    As of the date of this filing, Peloton is still working with the CPSC to modify the safety features of the Tread+ and the Tread+ has not been re-released for sale.  *See The Peloton Tread+*, One Peloton, https://www.onepeloton.com/tread-plus/sign-up (last visited Jan. 21, 2022).

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

96.    Peloton is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of Defendants and other Company officers, directors, employees, and agents is similarly imputed to Peloton under *respondeat superior* and agency principles.

### B.    Defendants Acted With Conscious Misbehavior Regarding The Safety Concerns Related To The Tread+ And The Tread

97.    All Defendants had possession of or access to information indicating that the Tread and Tread+ were causing serious safety events and injuries prior to and during the Class Period.

#### 1.    Peloton's Federal Safety Reporting Obligations

98.    Under Section 15 of the Consumer Product Safety Act ("**CPSA**"), 15 U.S.C. § 2064, a manufacturer, importer, distributor, or retailer of a consumer product that is distributed in commerce must inform the CPSC "immediately" upon the receipt of information that "reasonably supports the conclusion that such product – . . . contains a defect which could create

a substantial product hazard…; or creates an unreasonable risk of serious injury or death." 15 U.S.C. § 2064(b). The CPSA defines a "substantial product hazard" as "a product defect" that "creates a substantial risk of injury to the public." 15 U.S.C. § 2064(a). The CPSC instructs companies to consider all reasonably available information to determine "whether it suggests the existence" of a product defect or unreasonable risk. Information which should be reported; evaluating substantial product hazard, 16 C.F.R. § 1115.12(f). Examples of such information include engineering, quality control, or production data; information about safety-related production or design changes; information from an independent testing laboratory; product liability suits and claims for personal injury or property damage; consumer complaints; information received from CPSC; and information received from other firms. 16 C.F.R. § 1115.12(f). With regards to reporting an "unreasonable risk of serious injury or death," the CPSC's regulations provide that the duty to notify the Commission is triggered by information that reasonably supports the conclusion that such a "risk" is presented. 16 C.F.R. § 1115.6(a). Thus, the CPSC has stated that companies "should not wait for such serious injury or death to actually occur before reporting." 16 C.F.R. § 1115.6(a).

99.     As a result of this reporting requirement, Peloton was obligated to gather information regarding the safety of the Tread+ and Tread from quality control and production data, independent testing, product liability suits, consumer complaints, and information received from the CPSC. Peloton was then required to document any serious safety events and provide reports to the CPSC.

100.     Indeed, Peloton had a detailed system for tracking and monitoring the experiences of its Members, collecting vast amounts of data that would have included safety concerns brought to the Company's attention. *See* ¶¶ 45-54.

101.    The amount of data collected by the Company, coupled with the Company's legal reporting requirement under CPSA, support an inference that Defendants were well aware of the safety issues with its products prior to public disclosure.

102.    Notably, this data appears to have been readily available to Defendants, as evidenced by the fact that the CPSC's and Health Canada's recall notices contained the number of reports that were received by Peloton itself.  The CPSC's Tread+ Recall Notice and the CPSC Tread Recall Notice both stated that the Company itself received 72 reports of adults users, children, pets and/or objects being pulled under the rear of the Tread+ and 18 reports of the Tread screen loosening, and 6 reports of the screen falling off.  ¶ 88.  Health Canada's recall notice stated that Peloton itself had received 83 incident reports in Canada.  *See* ¶ 89.  As well, it was Peloton that prepared the report regarding the child's death and provided it to the CPSC. *See* ¶ 78.  These reports were gathered pursuant to the Company's obligation to notify the CPSC of serious safety risks concerning Peloton's products.

103.    Peloton's legal department, overseen by Kushi, was responsible for fulfilling Peloton's regulatory compliance obligations.  *See* Lauren Gay, LinkedIn, https://www.linkedin.com/in/lauren-gay-shohat-b3423231/ (last visited Jan. 21, 2022). Therefore, Kushi would have also been involved in discussions with the CPSC regarding Peloton's product recalls.

### 2.    Safety Information Was Escalated Up The Chain To Peloton's Executives

104.    The safety events and injuries set forth in Exhibit A or that were the subject of the CPSC Tread+ Recall Notice and the CPSC Tread Recall Notice were directly reported to Peloton's Member Support team from customers, were observed by Community Associates on social media, or were gathered through Peloton's data analytics.

105.    In regard to customers directly reporting to Peloton, Exhibit A notes that at the very least, 15 of the safety events and/or injuries caused by the Tread+ were reported directly to Peloton from members.  As well, at the very least, four of the events regarding the Tread were reported directly to Peloton.  *See* ¶ 31.  Exhibit A also shows that 81 of the events were shared on Peloton members-only Facebook groups that were monitored by the Company: 11 events were posted on the official, sponsored Facebook Peloton Member Page, 5 events were posted on the Company's official, sponsored Facebook Peloton Mom Group page, and 65 of the events were posted the unofficial Facebook Peloton Tread Group page.  Thus, these safety events and injuries were provided to and documented by the Member Experience division at Peloton.  *See* ¶¶45-54.

106.    Knowledge of the safety events and injuries were ultimately escalated up through the Member Experience division to the Individual Defendants.  Indeed, Cale Brock informed CW1 on several occasions that executives had been notified about injuries caused by Peloton machines at various meetings attended by the executives.  Brock explained that he learned of this at meetings that he had attended.  As well, a former "Community Lead" for Peloton in the social media division named Delaney Spetnagel wrote that one her responsibilities was to acknowledge and resolve "confidential inquiries on behalf of Peloton Executives and Legal Counsel."  *See* Delaney Spetnagel, LinkedIn, https://www.linkedin.com/in/delaneyspetnagel (last visited Jan. 21, 2022).

107.    Peloton's safety practices clearly evince that the Company's executives were well aware of the risk of items being sucked up under the Tread+.  CW1 explained that Peloton showrooms allowed customers to do a test run on an in-store Tread+ model, however, no one else could accompany the runner into the room when the Tread+ was in use, and especially not children.  Also, according to Confidential Witness 2 ("**CW2**"), a Peloton Tread Specialist from

October 2020 to May 2021, when the Tread+ was installed in a customer's home, Peloton instructed the customer that the Tread+ should not be in rooms that children can access and that the machine should be assembled a certain number of feet from the walls and/or any other furniture.  CW2 also explained that customers were told that exercise balls should also not be in the same room as the treadmill.  Given that these were official Peloton policies that applied to all showrooms and all deliveries, they would have been put in place by Peloton executives. Therefore, as Peloton executives, the Individual Defendants were aware of the safety risk of children or other items being sucked underneath the Tread+.

108.    Further, Peloton's detailed member data collection efforts indicate that the Company was aware of the risks posed by its treadmill products, and those risks would have been escalated to the Individual Defendants.

109.    For example, Olson explained that "[w]e capture *every single piece of member feedback across all channels, and read it back to the entire organization on a regular basis* to identify emerging trends and areas for improvement.  The voice of our Members informs everything we do, from developing new product features like 'Now Playing' and music playlist previews to creating entirely new products, like the Peloton Tread."  *See* ¶ 47.

110.    The member feedback was compiled by Peloton's Member Experience division and circulated to the entire organization on a monthly basis in "Voice of the Member" reports. *See* ¶ 53.  As well, when the Member Experience division identified an issue amongst the member feedback that needed to be addressed, it would work specifically with the relevant division within Peloton to address the issue.

111.    The hardware products team in the Connected Fitness Products division at Peloton was responsible for addressing issues with Peloton's machines such as the Tread and

Tread+.  *See CNBC Transcript: Peloton's Tom Cortese Speaks with CNBC's Julia Boorstin Live During the CNBC Disruptor 50 Summit Today*, CNBC (Oct. 21, 2021); https://www.cnbc.com/2021/10/21/cnbc-transcript-pelotons-tom-cortese-speaks-with-cnbcs-julia-boorstin-live-during-the-cnbc-disruptor-50-summit-today.html.  This division was overseen by Co-Founder and Chief Product Officer, Tom Cortese.  *See* Meet Our Team, One Peloton, https://www.onepeloton.com/company/team (last visited Jan. 14, 2022).  Thus, the Member Experience division would have worked with the hardware products team to address the safety events and injuries associated with the Tread and Tread+.

112.    By virtue of their positions and responsibilities at the Company, the Individual Defendants had access to this internal information regarding safety concerns related to the Company's products.

113.    Additionally, given the centrality of addressing member concerns to the Company's business model, it can be inferred that Defendants were involved in, and had knowledge of, safety concerns that were amply documented in a variety of ways.

### C.    Defendants Were On Notice Of The Possibility Of A Recall

114.    Defendants were on notice of the abnormally high possibility that the CPSC may request that Peloton recall the Tread+ and Tread given that the Company had gone through the same procedure for another of its defective products during the Class Period.  Indeed, on October 15, 2020, the CPSC announced that Peloton recalled approximately 54,000 clip-in pedals fitted on Peloton bikes sold between 2013 and 2016 because the pedals can unexpectedly break during use, causing laceration injuries.  *See Peloton Recalls PR70P Bike Pedals Due to Laceration Hazard (Recall Alert)*, CPSC (Oct. 15, 2020), https://www.cpsc.gov/Recalls/2021/Peloton-Recalls-PR70P-Bike-Pedals-Due-to-Laceration-Hazard-Recall-Alert.  The recall was initiated after Peloton received 120 consumer reports of pedal breakages, including 16 reports of leg

injuries, five of which required medical attention such as stitches.  *Id.*  These injuries were far less serious than those observed with the Tread+, and yet they resulted in a recall.

115.    As well, other treadmill companies have recalled machines in instances where the safety events were far less serious and/or the company reported a far fewer safety events.  For example:

- In 2008, Cybex International, Inc. ("Cybex") announced the recall of 20,000 treadmills after receiving 24 reports of the device speeding up unexpectedly due to a malfunction in the control board.  *See* Press Release, *Cybex International Recalls Treadmills Due to Fall Hazard; Can Speed Up Unexpectedly*, CPSC (Oct. 29, 2008), https://www.cpsc.gov/Recalls/2008/cybex-international-recalls-treadmills-due-to-fall-hazard-can-speed-up-unexpectedly.

- In 2007, Cybex announced the recall of 4,700 treadmills after receiving five reports of treadmills overheating or catching fire resulting in damage to the treadmill, but no injuries.  *See* Press Release, *Cybex International Inc. Recalls Treadmills Previously Repaired Due to Fire Hazard*, CPSC (Oct. 23, 2007), https://www.cpsc.gov/Recalls/2008/Cybex-International-Inc-Recalls-Treadmills-Previously-Repaired-Due-to-Fire-Hazard.

- In 2006, Vision Fitness announced the recall of 480 treadmill consoles after receiving one report that the treadmill can unexpectedly increase in speed and elevation.  Press Release, *Vision Fitness Recalls Treadmill Console to Repair Unexpected Acceleration Hazard*, CPSC (June 12, 2006), https://www.cpsc.gov/Recalls/2006/vision-fitness-recalls-treadmill-console-to-repair-unexpected-acceleration-hazard.

- In 2006, Endurance Fitness announced the recall of 700 treadmills after receiving nine reports that the treadmill unexpectedly accelerates or decelerates, possibly causing the user to fall.  *See* Press Release, *Endurance Treadmills Recalled For Unexpected Speed Changes Posing Fall Hazard*, CPSC (June 7, 2006), https://www.cpsc.gov/Recalls/2006/endurance-treadmills-recalled-for-unexpected-speed-changes-posing-fall-hazard.

- In 2005, Sportcraft announced the recall of 12,000 treadmills after receiving 110 reports of unexpected acceleration, 14 of which resulted in minor injuries, including sprains and bruises.  *See* Press Release, *CPSC, Sportcraft Announce Recall of Treadmills*, CPSC (July 28, 2005), https://www.cpsc.gov/Recalls/2005/cpsc-sportcraft-announce-recall-of-treadmills.

- In 2005, ICON Health & Fitness, Inc. ("ICON") announced the recall of 16,700 Epic T60 treadmills after receiving two reports of minor foot injuries and five reports of property damage due to a malfunctioning gas spring/shock.  *See* Press Release, *CPSC, ICON Health & Fitness, Inc. Announce Recall to Repair Epiq T60 Treadmills*, CPSC (Aug. 3, 2005), https://www.cpsc.gov/Recalls/2005/cpsc-icon-health-fitness-inc-announce-recall-to-repair-epic-t60-treadmills.

- In 2003, Cybex announced the recall of 33,719 treadmills after receiving five reports that the treadmills caused fires resulting in property damage.  *See* Press Release, *CPSC, Cybex International Inc. Announce Recall of Treadmills*, CPSC (Oct. 8, 2003), https://www.cpsc.gov/Recalls/2003/cpsc-cybex-international-inc-announce-recall-of-treadmills.

- In 2002, ICON announced the recall of 7,500 hikers after receiving 14 reports of the machines smoking and plastic pieces melting. *See* Press Release, *CPSC, ICON Health & Fitness Inc. Announce Recall of Hiker Exercise Equipment*, CPSC (Mar. 12, 2002), https://www.cpsc.gov/Recalls/2002/cpsc-icon-health-fitness-inc-announce-recall-of-hiker-exercise-equipment.

**D.      The Financial Gains Realized by Peloton's Executives and Directors**

116.      During the Class Period, while children and pets were being injured by the Tread+, Peloton executives were profiting handsomely from sales of Peloton stock.

117.      For example, during the Class Period, Foley sold $76,814,965.79 in Peloton stock, Woodworth sold $22,970,266.19 in Peloton stock, and Kushi sold $52,223,767.54 in Peloton stock, for a combined total of $152,008,999.52 stock sold by the Individual Defendants.

118.      As well, Peloton President and Director William Lynch sold $179,685,352.33, in Peloton stock during the Class Period and Chief Product Officer Tom Cortese sold $73,786,724.80 in Peloton stock during the Class Period, which together with the Individual Defendants, resulted in $405,481,076.65 in stock sales by key Peloton insiders.

**E.      Defendants' Financial And Commercial Experience**

119.      All Defendants were highly educated, trained and experienced in sales, marketing, and/or financing and were therefore well-aware of the magnitude of the safety events and injuries associated with the Tread and Tread+.

120.      As set forth below, Defendants are sophisticated business executives, with significant managerial experience, who are well-versed in the customs and practices of their industry. Therefore, Defendants were well aware of their duty to be forthcoming in their public statements about Peloton's business.

121.    John Foley has more than 31 years of commercial operations and management experience, and several years' experience serving in a CEO position. *See* John Foley, LinkedIn, https://www.linkedin.com/in/johnpfoley/ (last visited January 21, 2022). Prior to founding Peloton in 2012, Foley served as President of eCommerce, at Barnes & Noble from 2010 to 2012. *Id.* Before joining Barnes & Noble, Foley spent three years as CEO of Evite.com and five years as CEO of Pronto.com. *Id.* Foley has an undergraduate degree from the Georgia Institute of Technology in industrial engineering, and an M.B.A. from Harvard Business School. *Id.*

122.    Jill Woodworth has nearly 27 years in the financial experience. Jill Woodworth, LinkedIn, https://www.linkedin.com/in/jill-woodworth-91425b24/ (last visited January 21, 2022). Prior to joining Peloton, Woodworth spent twelve years as a Managing Director at J.P. Morgan. *Id.* Before that, Woodworth spent nearly ten years as an investment banker at Morgan Stanley. *Id.* Woodworth has an undergraduate degree in economics from Massachusetts Institute of Technology. *Id.*

123.    Hisao Kushi has over twenty years of corporate and legal experience. *See* Hisao Kushi, LinkedIn, https://www.linkedin.com/in/hisao-kushi/ (last visited Jan. 21, 2022). Prior to joining Peloton, Kushi served as Chief Operating Officer of Evite. *Id.* Before joining Evite, Kushi served as General Counsel for several Liberty Media entities including BuySeaons, Evite, Gifts.com, and Liberty Interactive Advertising. *Id.* Kushi has an undergraduate degree from the University of Massachusetts Amherst and a law degree from Boston College Law School. *Id.*

124.    Defendant Brad Olson has nearly twenty years of corporate experience.  Brad Olson, LinkedIn, https://www.linkedin.com/in/bradleyjolson/ (last visited Jan. 21, 2022).  Prior to joining Peloton, Olson served as the Vice President of the Starwood Preferred Guest Program. *Id.* Before joining Starwood, Olson spent eight years as a consultant and eventually Manager at

Bain & Company.  *Id.*  Olson has an undergraduate degree and MBA from Harvard University. *Id.*

### F.    The Importance Of The Tread+ And Tread To Peloton's Financial Success

125.    Because the fraud alleged herein relates to the primary business of Peloton, knowledge of the facts underlying the fraud may be imputed to Defendants.

126.    During the Class Period, Peloton had two main sources of revenue: Connected Fitness Products and Subscription.  *See* 2020 Form 10-K at 37.

127.    Revenue from the Connected Fitness Products segment was derived from, among other things, Peloton's sales of the Tread+ and Tread.  *See* 2020 Form 10-K at 6.

128.    Notably, for the majority of the Class Period, Peloton's Connected Fitness Product Segment consisted of just two products, its flagship Bike and the Tread+. Peloton only introduced two new products in September 2020. *See* Press Release, Peloton Interactive, Inc., *Peloton Expands Product Suite With All New Bike+ And Tread, Offering More Ways For People To Access And Enjoy World-Class At-Home Fitness* (Sept. 8, 2020), https://investor.onepeloton.com/news-releases/news-release-details/peloton-expands-product-suite-all-new-bike-and-tread-offering ("Sept. 2020 Press Release"); *see also* ¶ 17. Further, even when the Tread was introduced, Peloton only had four products for sale. Sept. 2020 Press Release.

129.    From 2018 to May 2021, Peloton sold approximately 125,000 Tread+ machines. *See* ¶ 19. At a sale price of $4,295, the sale of 125,000 Tread+ machines yielded approximate revenues of $536,875,000 for Peloton in just three short years.  From December 2020 to May 2021, Peloton sold approximately 6,450 Tread machines.  *See* ¶ 29.  At the sale price of $2,495, the sale of 6,450 Tread machines yielded approximately revenues of $16,092,750.

130.    Peloton frequently discussed the importance of the Tread+ and Tread to the Company.  For example, on a conference call on May 6, 2020, Foley stated that the tread category "is a high priority for Peloton" and investors should not take the pause in delivering Tread+ machines as a reflection of the Company's "focus or the importance of the tread category for Peloton.  It remains a super high priority[.]"  Peloton Interactive, Inc., FQ3 2020 Earnings Call (May 6, 2020) (transcript available from S&P Global Market Intelligence).  Foley also viewed the treadmill line as a greater growth opportunity than the bike line, stating, "[w]e are as confident as ever that our new tread, combined with our existing tread, now known as Peloton Tread+, is a better best tread hardware portfolio that represents an enormous growth opportunity for Peloton over the coming years, multiples of our bike opportunity as we view the tread line as a portal to a full-body workout."  Peloton Interactive, Inc., FQ4 2020 Earnings Call (Sept. 10, 2020) (transcript available from S&P Global Market Intelligence).

131.    The frequency with which Defendants and analysts spoke about the Tread+ and the Tread also indicates its importance to the Company, as it was often referenced on conference calls with analysts.  *See* Peloton Interactive, Inc., FQ2 2021 Earnings Call (Feb. 4, 2021) (transcript available from S&P Global Market Intelligence); Peloton Interactive, Inc., FQ1 2021 Earnings Call (Nov. 5, 2020) (transcript available from S&P Global Market Intelligence); Peloton Interactive, Inc., FQ4 2020 Earnings Call (Sept. 10, 2020) (transcript available from S&P Global Market Intelligence).

132.    Moreover, the safety events and injuries observed with the Tread+ were very serious.  The fact that small children were being pulled underneath the treadmill and burned, maimed, and killed is alarming.  These are the types of events that are easily ignored and would have immediately been drawn to the attention of Peloton's executives.

133.    Based on the fact that Tread+ was only one of two products sold by Peloton for the majority of the Class Period, and even when the Tread was introduced, Peloton only had four products, the treadmill generated substantial revenues for Peloton and the treadmills were the subject of Defendants' frequent discussions, in combination with the severity of the safety events and injuries observed, it is reasonable to infer that Defendants were aware of the facts that were omitted and misrepresented by them as alleged herein.

### G.    SOX Certifications

134.    Defendants Foley and Woodworth signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Peloton's September 11, 2020 Form 10-K annual report for the year ended June 30, 2020. The certifications state that quarterly report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, amended," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company." *See* Exs. 32.1, 32.2 to 2020 Form 10-K.  The certifications also state, in relevant part:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

*See Id.*

135.    The November 6, 2020 Form 10-Q contained substantially similar certifications for the quarter ended September 30, 2020 signed by Defendants Foley and Woodworth. See Exs. 31.1, 31.2, 32.1, 32.2 to 2021 Q1 Form 10-Q.

136.    The February 5, 2021 Form 10-Q contained substantially similar certifications for the quarter ended December 31, 2020 signed by Defendants Foley and Woodworth. See Exs. 31.1, 31.2, 32.1, 32.2 to 2021 Q2 Form 10-Q.

## IX.    LOSS CAUSATION

137.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial damages.

138.    During the Class Period, Lead Plaintiff and other Class members purchased Peloton securities at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Peloton securities declined significantly causing Lead Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

139.    Defendants made false and misleading statements and material omissions regarding the safety of Peloton's Tread+ and Tread.  On the strength of these false and misleading statements and material omissions, the price of the Company's securities was artificially inflated to a Class Period high of $167.42 per share on January 13, 2021.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Peloton's business, operations, performance, and prospects.  When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Peloton securities declined.

140.    The true facts and risks regarding the safety of Peloton's Tread+ and Tread which were omitted and/or misrepresented by Defendants eventually caused the price of Peloton's securities to decline on two occasions, thereby causing harm to investors.

141.    First, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding the safety of Peloton's Tread+ and Tread materialized, on March 18, 2021. when Peloton announced the death of a child, causing investors to suffer losses as the price of Peloton's common stock dropped $5.05, or 4.7%, from a close of $107.79 on March 17, 2021 to a close of $102.74 on March 18, 2021.  *See* ¶ 71.

142.    Then, Defendants' statements were further partially corrected, and the risks concealed by the undisclosed facts regarding the safety of Peloton's Tread+ and Tread materialized, on April 17, 2021, when the CPSC issued its warning regarding the Tread+, causing investors to suffer losses as the price of Peloton common stock dropped $16.28, or approximately 14%, over the course of three trading days, from a close of $116.21 on April 16, 2021 to a close of $99.93 on April 21, 2021.  *See* ¶ 77.

143.    Then, Defendants' statements were further partially corrected, and the risks concealed by the undisclosed facts regarding the safety of Peloton's Tread+ and Tread materialized, on May 5, 2021 when Peloton announced the recall of the Tread+ and Tread, causing investors to suffer losses as the price of Peloton common stock dropped $14.08, or approximately 14.5%, from a close of $96.70 on May 4, 2021 to a close of $82.62 on May 5, 2021.  *See* ¶¶ 10, 91.

144.    Accordingly, as a result of their purchases of Peloton's publicly traded securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic losses and damages.

## X.    CLASS ACTION ALLEGATIONS

145.    Lead Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired Peloton securities during the Class Period and were damaged on the revelations of the alleged corrective disclosures. (the "**Class**").

146.    Excluded from the Class are Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

147.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Peloton securities were actively traded on the NASDAQ Global Select Market.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Peloton or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

148.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Peloton securities were actively traded on the NASDAQ Global Select Market, which is an efficient market.  While the exact number of Class members cannot be determined at this early stage, Lead Plaintiff believes that hundreds or thousands of people held Peloton securities during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Peloton or its transfer agent and may be

notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

149.    Lead Plaintiff's claims are typical of the claims of the Class because Lead Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained herein.

150.    Lead Plaintiff will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiff has no interests that are contrary to or in conflict with those of the Class.

151.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)    Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)    Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Peloton's securities to be artificially inflated during the Class Period;

d)    Whether Defendants acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

e)    Whether Defendants were controlling persons of Peloton;

f)      Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

g)      Whether Class members have sustained damages, and if so, the proper measure of damages.

152.    Lead Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

153.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## XI.    CONTROL PERSON LIABILITY

154.    Defendants, because of their positions with Peloton, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each Defendant possessed the power to direct or cause the direction of the management and policies of Peloton.  Each Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to the safety of Peloton's Tread+ and Tread.  Each Defendant was provided with copies of the Company's SEC filings, reports, promotional materials, and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each Defendant knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public,

and that the positive representations and omissions which were being made were then materially false and/or misleading.

## XII.   THE FRAUD ON THE MARKET PRESUMPTION

155.   The false and/or misleading statements alleged herein were material and public and, at all relevant times, the market for Peloton's securities was an efficient market for the following reasons, among others:

a)   Peloton's securities were listed on the NASDAQ Global Select Market, a highly efficient market;

b)   As a registered and regulated issuer of securities, Peloton filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c)   Peloton regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d)   The market reacted to public information disseminated by Peloton; and

e)   At least fourteen analysts followed Peloton's business and wrote reports which were publicly available and affected the marketplace.

156.   As a result of the above, the market for Peloton's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical daily trading prices and volumes of Peloton securities are incorporated herein by reference.

157.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Peloton's securities.  Without knowledge of the misrepresented or omitted facts, Lead Plaintiffs and other members of the Class purchased Peloton securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Peloton's securities was artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## XIII.  NO STATUTORY SAFE HARBOR

158.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

159.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

160.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

161.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

162.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such statements were also not accompanied by cautionary language

that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any pharmaceutical company, and misleadingly contained no factual disclosure of any of the specific details concerning the safety of Peloton's Tread+ and Tread, or similar important factors that would give investors adequate notice of such risks.

163.    Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Peloton who actually knew that each such statement was false or misleading when made.

## XIV.   CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

164.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

165.    This Count is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

166.    During the Class Period, Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of

business which operated as a fraud and deceit upon Lead Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5(a) – (c) promulgated thereunder.

167.    The acts and scienter of Defendants and other Company employees are imputed to the Company under the principles of agency and *respondeat superior*.

168.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the safety of Peloton's Tread+ and Tread as reflected in the misrepresentations and omissions set forth above.

169.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

170.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

171.    Lead Plaintiff and other Class members purchased Peloton securities, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In doing so, Lead Plaintiff and other Class members relied on the integrity of the market price for Peloton securities that was artificially inflated due to the false and misleading statements made by Defendants, and/or an absence of

material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

172.    Lead Plaintiff and other Class members were damaged as a result of Defendants' false and/or misleading statements and misrepresentations and omissions of material facts. Lead Plaintiff and other Class members would not have purchased Peloton securities at the prevailing prices had they known the truth about the matters discussed above.

173.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other Class members have suffered damages in connection with their purchases or acquisitions of Peloton securities.

174.    Lead Plaintiff filed this action within two years after the discovery of the facts constituting the violation, including facts establishing scienter and other elements of Lead Plaintiff's claims, and within five years after the violations with respect to Lead Plaintiff's investments.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against All Defendants

175.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

176.    This Count is asserted against Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

177.    As alleged herein, Defendants caused Peloton to violate Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

178.    Each Defendant, by reason of his or her status as a senior executive officer and/or director of Peloton, directly or indirectly, controlled the conduct of the Company's business and

its representations to Lead Plaintiff and other Class members, within the meaning of Section 20(a) of the Exchange Act. Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases, and other statements related to Lead Plaintiff's and other Class members' investments in Peloton securities within the meaning of Section 20(a) of the Exchange Act. Therefore, Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

179.    Defendants controlled and had the authority to control the content of the Company's SEC filings, press releases, promotional material, and other statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

180.    Defendants knew or recklessly disregarded the fact that Peloton's representations were materially false and misleading and/or omitted material facts when made, and are therefore culpable participants in the fraud. In so doing, Defendants did not act in good faith. By virtue of their high-level positions and their participation in and awareness of Peloton's operations and public statements, Defendants were able to and did influence and control Peloton's decision making, including controlling the content and dissemination of the documents that Lead Plaintiff and other Class members contend contained materially false and misleading information and on which Lead Plaintiff and other Class members relied.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on his own behalf, and on behalf of the Class, demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as Class representative;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and statements alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert and consultant fees, and other costs;

D.    Awarding damages in favor of Lead Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law; and

E.    Awarding such other and further relief as this Court may deem just and proper.

## XVI.  JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: January 21, 2022                          Respectfully submitted,

                                                 **FARUQI & FARUQI, LLP**

                                                 By:   _/s/ James M. Wilson, Jr._
                                                       James M. Wilson, Jr.

                                                 James M. Wilson, Jr.
                                                 Robert W. Killorin
                                                 Megan M. Remmel
                                                 **FARUQI & FARUQI, LLP**
                                                 685 Third Avenue, 26th Floor
                                                 New York, NY 10017
                                                 Telephone: 212-983-9330
                                                 Facsimile: 212-983-9331
                                                 Email:  jwilson@faruqilaw.com
                                                         rkillorin@faruqilaw.com
                                                         mremmel@faruqilaw.com

*Attorneys for Lead Plaintiff and Lead
Counsel for the putative Class*