1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3     - - - - - - - - - - - - - - - - X
                                       :
 4                                         21-CV-02369(CBA)
                                       :
 5     IN RE PELOTON INTERACTIVE INC.,     United States Courthouse
       SECURITIES LITIGATION           :   Brooklyn, New York
 6
                                       :
 7                                         June 8, 2022
       - - - - - - - - - - - - - - - X   10:00 a.m.
 8

 9                   TRANSCRIPT OF ORAL ARGUMENT
               BEFORE THE HONORABLE CAROL BAGLEY AMON
10                   UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12
       For the Plaintiffs:          FARUQI & FARUQI, LLP
13                                  685 Third Avenue, 26th Floor
                                    New York, NY 10017
14
                                    BY: JAMES M. WILSON, JR., ESQ.
15                                      MEGAN REMMEL, ESQ.
                                        DYLAN WEEKS, ESQ.
16

17     For the Defendants:          LATHAM & WATKINS, LLP
                                    555 Eleventh Street, NW
18                                  Suite 1000
                                    Washington, DC 20004
19
                                    BY: ANDREW CLUBOK, ESQ.
20                                      WHITNEY WEBER, ESQ.
                                        NICHOLAS J. SICILIANO, ESQ.
21                                      STEVE FELDMAN, ESQ.

22
       Court Reporter:             Andronikh M. Barna
23                                 225 Cadman Plaza East
                                   Brooklyn, New York
24                                 (718) 613-2178

25     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription.
```

2

1          THE LAW CLERK:  This is In Re: Peloton, No.
2    21-CV-2369.
3          For plaintiffs we have James Wilson.
4          For defendants we have Andrew Clubok and Whitney
5    Weber.
6          The court reporter is Nikki Barna.
7          THE COURT:  All right.  Good morning, everyone.  You
8    can be seated.
9          MR. WILSON:  Good morning, Your Honor.
10          THE COURT:  Can you give me that sheet?
11          Let me just initially make plain.  Counsel for both
12    sides had asked to bring laptops in for the purposes of their
13    presentation and that is fine.  I will just remind you that
14    you cannot record the proceedings on the laptops and there is
15    absolutely no broadcasting outside of the courtroom.
16          Do plaintiffs' counsel understand that?
17          MR. WILSON:  Fully, Your Honor, yes.
18          THE COURT:  And defense counsel?
19          MR. SICILIANO:  Absolutely, Your Honor.
20          THE COURT:  All right.  This is the defendant's
21    motion to dismiss and I believe it is Mr. Clubok who is going
22    to argue.
23          MR. CLUBOK:  Yes, Your Honor.
24          THE COURT:  Did I pronounce that correctly?
25          MR. CLUBOK:  You know, it's as good as most people

3

1    do.  It's Clubok.

2         THE COURT:  Clubok.  Well, I was not really that

3    close.  Okay.

4         MR. CLUBOK:  You can't imagine what I've gotten.

5         THE COURT:  Yes.  Well, the same is true with my

6    name.  It is a very short name and it can be pronounced a

7    million different ways.

8         Counsel, you might want to be seated.  I say that

9    only because of the microphones.  It is very hard; you end up

10   leaning over trying to talk into a microphone, so one of our

11   precautions has required us to be less formal, unfortunately.

12        But let me hear you on your argument.

13        MR. CLUBOK:  Thank you so much, Your Honor.

14        We do have a presentation and we think we have it

15   connected, but I'm not sure.  If it's not working, then we

16   will have to work around that.

17        THE COURT:  Do you know how to?

18        THE LAW CLERK:  I think it should be set for you.

19   Based on what I am looking at on the screen, I think that

20   things are currently set as such.

21        MR. CLUBOK:  If we can't get it to work, we'll

22   just --

23        THE LAW CLERK:  Let me try now.

24        THE COURT:  Well, no, we should -- you know, this is

25   the perennial problem here.

4

1      THE LAW CLERK:  Let me try this.

2      THE COURT:  Are you trying to get up a slide?

3      MR. CLUBOK:  Yes, Your Honor.

4      Oh, no.  So close.

5      THE COURT:  Did Victor have it working?

6      THE LAW CLERK:  He thought that he did.

7      Let me reach out to him to see.

8      THE COURT:  That is why I wanted him to.

9      THE LAW CLERK:  Let me reach out to him.

10      (Pause in proceedings.)

11      I reached out to Victor.

12      THE COURT:  Is he responding?

13      THE LAW CLERK:  Not quite yet.

14      But let me just try one other thing.

15      THE COURT:  Well, did he test it before?  Was it

16  tested before with my courtroom deputy?

17      MR. SICILIANO:  He suggested it was working if we

18  plugged it into the HDMI, but we never saw it on the exact

19  screen.

20      THE COURT:  Is it plugged in?

21      MR. SICILIANO:  It is.

22      MR. CLUBOK:  Your Honor, if we can't make it work, I

23  will just try to paint a picture with words.

24      THE COURT:  Your clients paid for this, right?

25      MR. CLUBOK:  We'll have to give a discount.

5

1          THE COURT:  Yes.

2          Ask Joe.

3          What did you plug it into?

4          MR. SICILIANO:  The HDMI cable.

5          THE LAW CLERK:  I believe it's set for HDMI input.

6          THE COURT:  It is?

7          THE LAW CLERK:  I will double-check that.

8          THE COURT:  Try calling Victor.

9          Oh, Joe, can you see if we can get this?  I do not

10    know if you have more experience with this.

11          (Pause in proceedings.)

12          THE LAW CLERK:  Are you connecting via HDMI or VGA?

13          MR. SICILIANO:  HDMI.

14          MS. WEBER:  Should we try this one, Joe?  You

15    could --

16          THE LAW CLERK:  Oh, Victor, thank you so much.

17          THE CLERK:  You should be up.

18          THE COURT:  It is not though.  It is not coming up.

19          THE CLERK:  They're not plugged in yet.

20          (Pause in proceedings.)

21          THE CLERK:  I can call tech.

22          THE COURT:  Victor, is it our end?

23          THE CLERK:  I'm not sure.

24          THE COURT:  Well, let's just go forward.

25          MR. CLUBOK:  That's fine, Your Honor.  To be honest,

6

1   I'm always more shocked when technology works than when it

2   doesn't.  I apologize.

3              THE COURT:  Yes.  I have no idea why it is not

4   working.

5              MR. CLUBOK:  That's okay.  We do have printouts.

6   It's difficult to see some of the content, but I will just do

7   the best I can.  It will be fine.  We've provided it.

8              THE COURT:  You want to give it to the Court?

9              MR. CLUBOK:  Yes, we will bring it up, Your Honor.

10             I'll just describe what you're not seeing.  Some of

11  the printouts, you can't see everything we would have

12  included.

13             THE COURT:  Okay.

14             MR. CLUBOK:  One more last-ditch effort.

15             (Pause in proceedings.)

16             THE COURT:  I would settle for air conditioning in

17  here.

18             Victor, don't call the tech people.

19             Okay.  Counsel, do you want to begin?

20             MR. CLUBOK:  Yes, Your Honor.  Thank you so much.  I

21  appreciate your patience.

22             Your Honor, again, it's Andrew Clubok and Whitney

23  Weber for the defendants.  We're here with our client, who is

24  in the courtroom.

25             Your Honor, this case involves public statements in

7

1    an investigation that followed the death of a child and the

2    underlying events are tragic, goes without saying.  But just

3    like Judge Failla found in the *Chipotle* case, not every

4    adverse event, even horrible events, give rise to securities

5    fraud.

6         So the question is, what did happen here?  And what

7    happened in this case is that in March of 2021, after learning

8    that a child had died while trying to use one of its

9    treadmills, Peloton disclosed this to the Consumer Product

10   Safety Commission and then issued a very public statement

11   warning all of its customers and then plaintiff admits all of

12   this happened.

13        In that initial public statement, and again in

14   another one they issued about a month later, Peloton stated

15   that it believed its treadmills were safe as long as the

16   instructions were followed.  And the plaintiffs do not allege

17   any facts anywhere in the complaint suggesting that that is

18   false, let alone that anyone at the company ever believed

19   otherwise.  In other words, Peloton over and over again, as

20   the plaintiffs note, warned its customers:  Don't let children

21   used the treadmill.  Keep objects away.  And almost bizarrely,

22   frankly, Your Honor, the plaintiffs say these very warnings,

23   the fact that Peloton kept warning its members, somehow those

24   warnings are evidence of scienter to commit securities fraud.

25   It really is kind of upsidedown, but it certainly doesn't meet

8

1    the standards of the PSLRA or the Second Circuit.

2           So what is true is that in the very first few weeks

3    after announcing this tragic accident, the company had a

4    vigorous and extremely public back and forth with the CPSC.

5    But all that showed was that the company strongly believed in

6    the safety of its treadmills, and they said so publicly.  They

7    said we believe in it.  The CPSC has asked us to consider

8    voluntarily recall.  Initially, they said we don't think so

9    because these injuries are all happening when users don't

10   follow instructions.  But after Peloton brought all of this

11   public attention on the tragedy, and it was Peloton who asked

12   for the attention and urged folks to come forward, dozens of

13   additional users did come forward with reports of injuries

14   that they allege.  And after just a few weeks, Peloton

15   gathered this data provided to the CPSC and then decided that

16   it had made a mistake in its initial reaction and that it was

17   in everyone's best interest to have a voluntary recall.

18          Now, this sequence of events should not and is not

19   penalized by the securities laws.  Okay?  Companies should be

20   encouraged to disclose accidents right away, as Peloton did,

21   in order to warn its users and prevent other accidents.  And

22   companies should be encouraged to be transparent if they make

23   mistakes in their initial reaction to an accident and a few

24   weeks later change their mind, particularly after they've

25   gotten more information, which they solicited by their initial

Andronikh M. Barna, Official Court Reporter, RPR, CRR

9

1 announcement.

2         THE COURT:  Let me ask you a question about the

3 March 18th statement.

4         In that statement, defendants say that we are aware

5 of only a small handful of incidents involving the Tread where

6 children have been hurt.  By my account, in the information

7 that was both conveyed to Peloton as well as Peloton's website

8 itself, or page, there were at least ten.  Why isn't that a

9 jury question about whether it is a false statement to say

10 there was a handful and isn't ten more than a handful?

11         MR. CLUBOK:  Whether or not ten is more than a

12 handful, that would be arguably an interesting question for a

13 products liability lawsuit or for some other kind of lawsuit.

14         But for securities fraud, the standards are pretty

15 exacting in terms of -- and the cases say over and over again,

16 many that they've cited, that say once you describe some

17 problems, you're not required to catalogue every single

18 instance.  The *Chipotle* case --

19         THE COURT:  This is not cataloguing every single

20 instance.  There is an affirmative statement that there were

21 only a small handful of incidents.  That could be -- if they

22 had conveyed at that time that there were allegations, at

23 least that they knew of, that at least ten children had been

24 injured, why wouldn't that be the kind of false statement that

25 -- or the kind of positive statement that was not accurate be

10

1    the type of statement that investors might have relied on; in

2    other words, this really is not a big deal, there were only a

3    few children, we will keep our investment?

4         MR. CLUBOK:  So there were 125,000, I believe,

5    Tread Pluses that could be sold at that point, according to

6    the complaint.  And whether five or ten is a small handful,

7    that's not usually the stuff of securities litigation.  We

8    cite a number of cases where parties aren't required with that

9    precision to describe things.  But I do agree with Your Honor;

10   that is the absolute closest call of where plaintiffs have

11   actually alleged a false statement.

12        THE COURT:  Do you agree, by the way, that it was at

13   least ten?  Because I think in your briefing you may have said

14   four.  So, do you agree it was at least ten?

15        MR. CLUBOK:  I think plaintiffs have alleged ten.

16   And I think you're right, if you parse through all of their

17   exhibits.

18        However, if you look at -- for example, I think it's

19   No. 11 in their Exhibit A.  Okay?  11 in their Exhibit A is

20   one of these ten.  Okay?  And 11 -- and there's a picture.

21   And they make quite a bit of it because it's a pretty

22   awful-looking picture if you have a kid.  And if you look at

23   Exhibit A and you look at No. 11, this is one of the ones that

24   they count in their ten.  And it talks about how Jonathan

25   Lazar wrote on his official Facebook Peloton group page that

1    his 11-year-old son was running on the Tread Plus, fell under

2    the running bed and his clothes and shoes were ripped off.

3    And so this is just a kid who is not supposed to be on the

4    treadmill who runs, falls.  If you have a treadmill in your

5    house, if you've ever been on a treadmill, you know this is

6    not a design defect.  It's not even alleged to be anything

7    other than kind of the normal terrible thing that can happen

8    if you let kids run on treadmills.

9              THE COURT:  Well, usually your clothes are not

10   ripped off if you fall off a treadmill.

11             MR. CLUBOK:  Well --

12             THE COURT:  Is that as a result of this lack of a

13   guard?

14             MR. CLUBOK:  No.  No, it's just from him -- there's

15   no allegation of that.  All there is, is he fell on a

16   treadmill.  You know, you can, it depends on --

17             THE COURT:  So does that take it to nine?

18             MR. CLUBOK:  Well, I think the point is, Your Honor,

19   there's that and there's other instances where the plaintiffs

20   have a mismatch of allegations but they don't ever say here

21   are the exact ones that the speakers who made allegedly false

22   statements at the time knew about when they specifically

23   spoke.

24             And what I was about to get to, Your Honor, is the

25   second half of the securities requirements.  There's really

12

1   two key things.  Obviously, you have to have a misstatement.

2   And I completely agree, that's the closest one that they've

3   alleged in this whole complaint.  But what you also have to

4   allege is a strong inference of scienter; that is, intention

5   to commit securities violations and you have to show some sort

6   of motive and, you know, effort to deceive the public where

7   you have an evil intent to commit securities fraud.  The

8   speaker at the time who made that statement is announcing a

9   terrible tragic accident.  He's not going out and selling

10  stock.  He's not, you know, hoping that the stock price stays

11  up for, what, a few weeks during the investigation only so

12  that when they get the facts and they decide to do the

13  voluntary recall, all the -- you know, the idea that that is a

14  plan right there would be saying terrible tragedy, our heart

15  goes out to the victims, we are aware of a small handful of

16  other incidents involving other children, and because it might

17  be nine and not five, he's intentionally trying to commit

18  securities fraud?  That's the kind of leap that other courts

19  have not allowed.

20          And what I do want to say is -- and that, by the

21  way, Your Honor, is the clearest.  That's, at most, the -- at

22  least where the plaintiffs have argued there's a statement and

23  they kind of narrow in on it, even if they don't have all of

24  the facts they need to support it --

25          THE COURT:  Let me ask you.

13

1          Is it required that there be a, quote, "motive

2     showing"?  Can't you raise a strong inference of scienter

3     other ways through the strength of circumstantial allegations

4     that they knew even if there was no motive?

5          MR. CLUBOK:  Well, you have to show the motive, but

6     you could -- you could show the motive through a strong

7     evidence of circumstantial evidence.  But Courts, all of the

8     Courts in the Second Circuit, you know, that we cite, in many,

9     many cases, including like in *Chipotle,* which is kind of a

10    similar incident where there's this highly publicized

11    food-borne illness, and *Chipotle* had first came out and said,

12    well, we're aware of a few instances and it turned out that

13    there were other instances and maybe some other sicknesses

14    that weren't really food-borne but they were neurovirus, and

15    the plaintiffs put together this whole complaint and they

16    identified, you know, a bunch of statements, not making it

17    clear which statements were said by whom and what they knew

18    when.  And Judge Fallia patiently went through every

19    statement, found that most don't even get out of the gate.

20    But for those that possibly do, she found no strong inference

21    of scienter to commit securities fraud because you don't have

22    the things that other courts have found.  You don't have

23    suspiciously-timed stock sales.  You don't have a reason why

24    an individual making a statement would try to commit

25    securities fraud.

14

```
 1              But the most important thing that I want to get
 2    to --
 3              THE COURT:  How about recklessness?  Is that
 4    sufficient to show motive?
 5              MR. CLUBOK:  No, Your Honor.  You have to show
 6    something more than that for securities fraud.  You really
 7    have to show not just not an ought-to-have-known or
 8    should-have-known -- and even we cite the cases for this in
 9    our papers -- it's an actual known.  Actually known.  In fact,
10    the standard is specific facts known to a specific individual
11    that contradicted what that individual said in a temporal
12    connection between that knowledge and those specific facts to
13    when they said these statements.  Basically, what did they
14    know, when did they know it, and what did they specifically
15    say that contradicted things they specifically knew.  That's
16    the Lululemon case, the Rio Tinto case, you know, on and on.
17    The Long Miao case.  The Rockwell case.
18              THE COURT:  But a moment ago you said you had to
19    show motive.  Under the JP Morgan Chase, it says:  The
20    requisite scienter can be established by alleging facts to
21    show either that defendants had motive and opportunity to
22    commit the fraud or strong circumstantial evidence of
23    conscious behavior or recklessness.
24              So, you do not have to show motive, right?
25              MR. CLUBOK:  Right, but you have to show -- I think
```

15

1    different courts have described it differently.  The

2    circumstantial evidence has to be strong of consciousness,

3    right?  Or rising really to a strong level to actually commit

4    securities fraud.

5         And let me -- if I may, Your Honor.  Setting aside

6    that one statement, the small handful, what the plaintiffs

7    have done is they've thrown in a blizzard of other allegations

8    that are not connected to the right chronology and in some

9    cases the plaintiffs themselves here have given you heavily

10   redacted or selectively quoted quotes.  And I want to just

11   walk through those because that's really what the Supreme

12   Court has said is required -- sorry, the Second Circuit says

13   is required.  And that's when we get to our slides.  And let

14   me just see if I can describe it to you even though you won't

15   have the benefit of the animations, so it may be a little hard

16   to read.

17        And by the way, Your Honor, if there is no motive,

18   just let's keep in mind, the circumstantial evidence has to be

19   extremely strong.  It really has to be something very strong.

20        But let's look.  And what the plaintiffs have done

21   here is they've thrown a lot of stuff in.  And this, again, as

22   Your Honor well knows, a securities fraud case is not like,

23   you know, a products liability case or some other case with a

24   different standard where if you get one little statement in,

25   that gets you past the motion to dismiss, everything is fair

16

1   game, and then you open up discovery.  We're talking about

2   several specific individuals who are going to be -- have to

3   deal with securities fraud allegations hanging over their

4   heads for a long time, the way these cases tend to go, and the

5   company having to deal with lots of different statements if

6   this whole complaint were allowed to just go forward.

7           THE COURT:  But if only one is found to be

8   actionable, you could just go forward on the one that was

9   actionable, correct?

10          MR. CLUBOK:  That's correct, Your Honor.

11          And what Your Honor would do though is Your Honor

12  would -- we don't have to move to strike here.  It's not like

13  a case where we have to move to strike the allegations to the

14  extent the plaintiffs have not supported their allegations of

15  other false statements with the specific particularly

16  required.  Your Honor should do what Judge Donnelly did in

17  *MTS*, what Judge Engelmayer did, what Judge Sullivan did in

18  *Rockwell*, which is, Your Honor needs to apply the PSLRA to

19  dismiss all of the noise in the complaint and leave whatever

20  false statements Your Honor believes are actionable and

21  there's specific scienter tied to those false statements.

22          So let me give clean examples and I think you'll see

23  what I'm talking about here.  The plaintiffs, you know, they

24  -- again, this is very much like the *Nokia* case where the

25  plaintiffs have thrown a lot of stuff up.  And what Judge

1   Karas in this court said, back maybe ten years ago, is if you

2   lay out all the allegations and you patiently go through them

3   chronologically and you match them up to what the speaker knew

4   when these statements were made, you'll see that many, if not

5   most, if not all of the statements have to be dismissed.

6           And the sort of easiest, most contained way to see

7   that is, there are statements about the so-called Tread.

8   Okay?  Now, there are two different treadmills that Peloton

9   sells.  One was the Tread Plus that allegedly had no guardrail

10  and some balls were sucked under and the children died, a

11  child died.  But the other treadmill is just called the Tread,

12  and that Tread is mostly sold in Canada.  There was only a few

13  thousand sold.  And there was a -- that was a small number of

14  incidents where, because of installation error, the monitor

15  fell off sometimes.  Okay?  And the plaintiffs have alleged

16  that -- if you look at slide 2 in our deck, here are all the

17  allegations they have about the Tread.  They say on

18  February 5th, 2021 there was a 10-Q.  Okay?  And they say that

19  the Peloton and the two individuals who signed that 10-Q,

20  that's the CEO and the CFO, Mr. Foley and Ms. Woodworth, made

21  false and misleading statements because here's all these risk

22  factors.  And Peloton lists a series of risk factors.  They

23  basically say our products could have design defects, there

24  could be litigation, there could be products liability, it

25  could lead to injuries.  They warned everybody that these

18

1    things could happen.  And that's February 5th, 2021.

2         And what the plaintiffs say in paragraph 65 of their

3    complaint is, they say -- I just want to focus on the Tread

4    part of this statement.  We'll come back to the Tread Plus.

5         THE COURT:  Well, is your whole point that at that

6    point in time there had been no showings that this thing, the

7    screen, had fallen off at the time this statement was made?

8         MR. CLUBOK:  You cut right through it.

9         And if you skipped ahead, you basically can -- we

10   tried to lay out very carefully the statements and we tried to

11   lay out very carefully the allegations and what you get to is

12   slide 8.  Slide 8 is a timeline.  And that thing in the

13   middle, that's supposed to be the ripped piece of paper, but

14   it shows it better on the screen than it does on the print.

15   But plaintiffs allege a 10-Q from February 5th.  They allege

16   that Ms. Woodworth, at a summit, said how the reviews of the

17   Tread have been phenomenal.  They talk about her speaking at

18   the JMP Securities Conference where she says the market

19   rollout is going very well, we're really excited about the

20   early reviews of the new Tread.  She makes these statements.

21        And every single time, if you look in the complaint,

22   the plaintiffs rotely say she lied because they -- I'm sorry,

23   Peloton knew that the Tread had caused accidents and they say:

24   See paragraphs 41 to 44.  When you go to paragraphs 41 to 44

25   in the complaint, the first allegation is about a March 9th

19

1    incident where the screen fell off and the woman or the man

2    jumped over it and wasn't injured.  And then a few other

3    incidents they're alleged to have been reported for the first

4    time in May of 2021.

5            By plaintiffs own allegations, this cannot possibly

6    be securities fraud.  And, in fact, under the PSLRA, it's

7    quite problematic that plaintiffs have tried to allege -- or

8    maybe, you know, look, if Peloton had done this, the

9    plaintiffs would say they were reckless.  Okay?  Or misleading

10   by omission.  The plaintiffs would have pretty harsh language.

11   If Peloton had claimed, as plaintiffs here claim, that these

12   statements from February and early March of 2021, which

13   predate the very first incident that they themselves allege,

14   could somehow have been securities fraud and they, in their

15   complaint, very specifically don't just say oh, gosh, these

16   are securities fraud, but they say they were securities fraud

17   because Peloton already knew somehow about Tread incidents.

18           And then they say:  See paragraphs 41 to 44.  When

19   you go to paragraphs 41 to 44, the incidents all occur -- the

20   first one occurs in March with no injury and the rest all

21   occur or are reported in May.

22           THE COURT:  Yes, okay.

23           MR. CLUBOK:  Okay.  So that's one set of statements

24   that should just not be in this case.  We should not have to

25   do discovery on the Tread.  We should not have to defend

20

1  Ms. Woodworth's statements that she made to this conference in

2  March.  She shouldn't be subject to the securities fraud

3  because of those statements.

4           THE COURT:  Is that the only claim against her?

5           MR. CLUBOK:  That's the bulk of the claims against

6  her.  We'll come back to -- there's some of -- because she

7  signed also the Qs in late 2020 and early 2021 on the Tread

8  Plus, and we'll talk about those in a minute.

9           Then we turn to Mr. Olson.  Okay?  Mr. Olson, also.

10 This was a travesty that he was put into this case.  Mr. Olson

11 is alleged -- the only allegation of Mr. Olson, and this is

12 paragraph 83 of the complaint, is that in April, April 30th,

13 2021, okay, five days before Peloton announces a voluntary

14 recall, Mr. Olsen is talking to CNN and he's talking to CNN

15 because Peloton is about to have this event they call

16 homecoming.  It's basically where members come to the home

17 office and they come in person and they get to meet their

18 favorite instructors and it's kind of a fun event that Peloton

19 did pre-pandemic.  And CNN is doing this story that says

20 Peloton is rolling out fans' most requested features.  And if

21 you look at the story, which is Exhibit 15, okay, and you look

22 at it, it's a fun story by CNN about how Peloton's rolling out

23 some new features and, by the way, they're going to have this

24 homecoming event, but hey, it's COVID.  It's -- you know, it's

25 a year into COVID and is that going to be a little awkward.

21

1          And by the way, Peloton was doing really well during

2     COVID, but now that people are coming back in real life,

3     you've got companies like SoulCycle, which are IRL gyms, you

4     know, and so forth.  And CNN is posing this question to

5     Mr. Olson, you know, what's it going to be like now that a) on

6     the one hand people are going back to their gyms and b) what

7     are you going to do about your own homecoming because it's,

8     you know, April of 2021.

9          THE COURT:  So is it your position the statement

10    refers to COVID?

11         MR. CLUBOK:  Absolutely.  It had nothing to do with

12    this case at all.

13         If you read in the context of this story, CNN at the

14    very end says to Mr. Olson, basically they're like -- you

15    know, they're saying:  Others are optimistic about Peloton's

16    position, partly thanks to communities -- this is CNN, the

17    reporter telling this story.  And they talk about how Peloton

18    is well positioned in the fitness space to capitalize on the

19    pandemic-induced customer behavior changes and credits its

20    cult-like following for further growing the company.  This is

21    the CNN reporter who says Olson and likely most of Peloton

22    members agree:  We obviously take our members' safety

23    seriously, he said, our members are excited to celebrate with

24    one another.

25         The whole story is about how the members are going

22

1    to come together to this homecoming and celebrate and there's

2    this question as to whether COVID -- you know, on the one

3    hand, COVID has helped Peloton supposedly because people

4    couldn't go to their gyms, but now Peloton has to compete.

5    This has nothing to do with securities fraud and Mr. Olson is

6    just there being interviewed for this fun story for CNN.  At

7    the very end, he makes this statement.

8            Now, plaintiffs want to keep Mr. Olson in this case

9    and accuse him of securities fraud with the theory that

10   Mr. Olson, who by the way is alleged to have sold no stock, on

11   April 30th intentionally -- when he's talking to the CNN

12   reporter about his big homecoming project and how members are

13   going to show up and meet their favorite instructors, he's

14   thinking himself I'm going to slip in security fraud at the

15   end by talking about safety and not getting in all the details

16   of the Tread incident, which is not even alleged, you know, to

17   be -- I mean, the story speaks for itself what it's about.  It

18   has nothing to do with the Tread.

19           THE COURT:  Okay.

20           MR. CLUBOK:  So that's Mr. Olson and that's the only

21   statement.  And with no scienter and with five days left in

22   the class period to keep him in this case would be

23   inconsistent with the PSLRA.

24           So let's go to the next one, Mr. Kushi.  And this is

25   the chief legal officer.

23

1          And again, by the way -- and by the way, I should

2     say this.  If you -- what the plaintiffs in this case did with

3     Mr. Olson is, in their complaint, paragraph 83, they quote the

4     first half of Olson's statement:  We obviously take our

5     members' safety seriously.

6          You asked me if I was saying this about COVID.  The

7     reason you were probably confused is because the plaintiffs

8     here selectively just quoted that first half.  They didn't

9     include the second half which, when you put that together, it

10    says:  Our members are excited to celebrate with one another.

11         And, Your Honor, frankly, there's a number of

12    documents that plaintiff cites and we -- and when they cited

13    in their complaint, of course the Supreme Court says you must

14    look at the entire document, you can't just take the

15    selectively quoted provision.  Plaintiffs here, not only did

16    they selectively quote portions of documents, but they've

17    opposed, in many respects, our request for judicial notice and

18    said they don't even want Your Honor to see the full

19    documents.  So that's what happened with Mr. Olson.

20         A similar thing happens with Mr. Kushi where they

21    cite a document that -- I'm sorry, they cite a posting

22    Mr. Kushi makes without giving all of the details.

23              THE COURT:  A posting of what?

24              MR. CLUBOK:  So this is April 17th.  Okay?  And it's

25    April 17th, right?  Now remember, Peloton, a month earlier,

1   announced this incident and Peloton has been gathering more

2   information ever since its public announcement.  And so on

3   April 17th, there's a press release and Mr. Kushi signs it.

4   And in this press release, the plaintiffs, in paragraph 78,

5   they say the statement -- the press release is false because

6   Peloton says at that point there's no reason to stop using the

7   Tread Plus as long as all warnings and safety instructions are

8   followed.

9           And then the plaintiffs, in paragraph 78, say:  As

10  hoped, this message received widespread attention, further

11  reinforcing this vital safety message.

12          So the plaintiffs allege that Mr. Kushi is not

13  telling the truth because he still says that Peloton believes

14  there's no reason to stop using the Tread Plus as long as you

15  follow the warnings and safety instructions.

16          By the way, that's absolutely true.  Peloton or

17  Mr. Kushi believes that to this day, that every single one of

18  the incidents was when the user was not following

19  instructions.  That doesn't mean that Peloton can finally say

20  we just can't trust people not to follow them and so they did

21  a voluntary recall.  But that's a true statement.

22          But what's more important here is that plaintiffs

23  then redact.  They use ellipses right at the end of that in

24  paragraph 78 and they say:  As hoped, this message received

25  widespread attention.

1          This message where Mr. Kushi -- the first half of

2    his message where he says we believe it's safe as long as you

3    follow the instructions, what they redact out is that

4    Mr. Kushi goes on to explain, speaking about the March message

5    that happened a month earlier.

6          He says:  Following this message -- talking about

7    the message that was issued a month earlier, the one we talked

8    about -- Peloton received additional reports of incidents that

9    had previously occurred.  Peloton promptly reported the

10   additional incidents to the CPSC and provided all subsequent

11   details that CPSC requested with the limited exception of

12   certain personally identifiable information that a few members

13   explicitly requested Peloton not to volunteer.

14         Right around the same time, on that same day or

15   maybe the day before, the CPSC issues its report saying that,

16   I think at that time, now a total of like nearly 40 incidents.

17         So Mr. Kushi is not -- you know, plaintiffs say, oh,

18   what Mr. Kushi says about the belief that if you follow

19   instructions, the Tread is still safe, that's false because

20   he's not talking about other incidents.  But he literally in

21   the next breath says, by the way, there have been many other

22   incidents.  And that same day, the CPSC -- or the day before,

23   the CPSC publishes the ones that Peloton provided.

24         So this cannot possibly be securities fraud.  But it

25   shows how the plaintiffs, through selective quotes and

26

1   selective redacting, make it look like Mr. Kushi was just out

2   of touch, like how could he possibly be saying this when he's

3   got this information.  He's specifically referring to the

4   information.

5          And this is very much like -- and this and other

6   allegations they make about this statement are really, I mean,

7   all four squares on what happened in the *Lululemon* case and

8   the *City of North Miami Beach* and other cases, again, that we

9   cite in our briefs.

10          One of the things that they say -- again, by the

11  way, they say -- if you look at paragraph 79, they say all the

12  reasons why this statement that Mr. Kushi made are false are

13  the following.  One, because there's ultimately 102 incidents,

14  ultimately in May.  But again, at that time there's only

15  allegations that Peloton knew about 39.  Those are disclosed.

16  They say, oh, well, what about the numerous events and

17  injuries that have been caused by the Tread, and they point to

18  paragraphs 41 through 44.  This is the -- they're recycling

19  the Tread claims, which again, no allegation that on

20  April 17th Mr. Kushi knew anything about the Tread other than,

21  at most, maybe one screen had fallen off in March.

22          And then they say, well, it's not true when --

23  because Peloton should or Mr. Kushi should have said that

24  Peloton was not fully cooperating with the CPSC, and they cite

25  to paragraphs 87, 94.  And what the plaintiffs say here is

27

1    look, you know, Peloton later, a few weeks later says, you

2    know, we should have done a recall.  We didn't do a recall

3    originally.  The CPSC wanted to do a recall, we didn't.  And

4    they're trying to say that somehow in April, like two and a

5    half weeks before Peloton makes this decision, Mr. Kushi

6    should have guessed it was going to happen or should have

7    known it would happen.

8            He's not hiding anything.  Peloton is being super

9    transparent.  What they said in March was -- or what they say

10   in April is, hey, we identified these incidents.  The CPSC

11   thinks we should recall.  We don't think so yet because we

12   still think as long as you follow the instructions, it's safe.

13   But they're not hiding the dispute to the CPSC.  This is not a

14   case where they got a Dear Doctor letter and for nine months

15   hid it while they kept selling drugs and the drugs kept

16   hurting people.  This is a case where they very publicly, very

17   transparently said CPSC is suggesting we might do a recall; we

18   don't think so yet.  Three weeks later or two -- yes, just

19   about three weeks later they say, you know what, we've gotten

20   more reports, we probably made a mistake from the outset,

21   we're doing a recall.

22           THE COURT:  How many additional reports did they get

23   between April and when they decided to do the recall?

24           MR. CLUBOK:  Well, according to plaintiffs, about

25   another several dozen.  It's kind of unclear, right?  Because

28

1   the plaintiffs -- it's really hard to follow their allegations

2   and to tie them to specific documents.  I think that the 102

3   incidents they're talking about or the hundred-some incidents,

4   those are the total that get reported by May.  Okay?  And just

5   like with the Tread, you know, by May there's a fairly large

6   number.  There's about a hundred or so for the Tread Plus.

7   And for the Tread there's, you know, I think six or something

8   like that.

9        But there's no -- if you go through the complaint,

10  all you find in the complaint of supported allegations that

11  you can actually tie up to a document, I think there is the 39

12  total known incidents that the CPSC reports.  And the CPSC

13  reports it publicly on the same day, or the day before, that

14  Peloton has shared with us 39 events, we're making them

15  public.  Peloton -- Mr. Kushi says, hey, we've got all these

16  additional events that we provided the CPSC and you can look

17  at their website.  And, you know, that's not securities fraud.

18  That's being as transparent as you can be.

19        By the way, Mr. Kushi doesn't sell any -- he doesn't

20  go out and sell stock after this.  There are no -- there are

21  zero suspicious stock sales of any of the insiders.  There's

22  -- some of them had 10b5-1 trading plans where you preset the

23  plan months ahead of time and you say that on, you know, such

24  and such a date I'm going to sell X percentage of stock and

25  you do that over the course of the year to kind of smooth out

29

1    your sales.  Those, obviously, are not securities fraud.

2         But very specifically, Mr. Kushi makes this

3    statement on April 17th.  You know, three weeks later on

4    May 5th, Peloton decides to change its course and announces

5    that it changed course and decides to do the recall.  It's not

6    like Mr. Kushi went out and sold any stocks.  He's not alleged

7    to have sold a single share.  And his stocks sales are all

8    publicly available.  They're Exhibit 15, I believe, or 17.

9    17, is what Whitney tells me.  And you could see all the

10   stocks sales and you can see that he didn't go rush out and

11   sell.

12        So, moving on.  On page 12 of our slide -- you asked

13   about Jill Woodworth -- there are two categories of statements

14   they try to get to move forward with Ms. Woodworth, some of

15   the Tread statements which we talked about.  The others are

16   the risk disclosures.  Okay?  And quite frankly, Peloton's

17   risk disclosures are as robust and fulsome as you're going to

18   find.  They basically say:  Warning, there might be --

19        THE COURT:  But they are all hypothetical and sort

20   of boilerplate, isn't it?  Don't most filings have these sort

21   of boilerplate things about, you know, we could be sued, this

22   could happen, the world could end?  You know.

23        MR. CLUBOK:  So this is where, like, you're darned

24   if you do and darned if you don't.

25        THE COURT:  Right.

30

1        MR. CLUBOK:  Your Honor, you call it boilerplate.

2   It's super specific.  I mean, if you look at the risk

3   disclosures, they're not just like we couldn't be sued.  That

4   would be boilerplate.  It's we sell these products, they could

5   be dangerous, there could be design defects.  If there are,

6   the design defects could cause injuries.

7        When you're investing in a company that sells, like,

8   automobiles or sells bikes or sells treadmills, a reasonable

9   investor, what do they know?  They, first of all, probably

10  should know that things can break down.  But that's not

11  enough.  And under the securities laws, you have to still tell

12  them.  And Peloton does that.  And if you say, well, gee, they

13  told them too much and that turns into boilerplate, it's like

14  what are they supposed to do?

15       Again, very similar to what happened in *Chipotle,*

16  where in *Chipotle*, Chipotle said:  Hey, we're a restaurant.

17  There could be food-borne illness.  People could get sick.

18  That could hurt us.  That could hurt our reputation.  And the

19  plaintiffs, they were trying to argue, oh, that's boilerplate.

20  And Judge Failla then ultimately said, in no uncertain terms,

21  what are you talking about?  That's not boilerplate.  That's

22  very specific to your industry.

23       THE COURT:  Well, tell me what is the appropriate

24  standard here, Counsel.  You say it is not simply that there

25  was an increased risk.

1            MR. CLUBOK:  Right.

2            THE COURT:  But is it a substantially certain to

3    occur?  Does that make it?

4            MR. CLUBOK:  I think that would make it,

5    substantially certain to occur.  It's really has the risk

6    materialized.  I think -- Your Honor, I think whether it has

7    materialized or it's substantially certain, like if you know

8    for sure it's about to happen tomorrow and it hasn't happened

9    today, I think that would probably be enough.

10            But plaintiffs don't come close on that here.  These

11   statements are made in late 2020 and the last one is made in

12   February of 2021.  At that time, it was not substantially

13   certain there was going to be a recall.  It certainly wasn't

14   substantially certain that there was a defect.  In fact, and

15   this is -- you have to go to plaintiffs' allegation.

16   Plaintiffs didn't allege it was substantially certain to

17   occur.  What plaintiffs alleged in their complaint is there is

18   an increased risk.  And once they saw the case law that said

19   that's not enough, in their opposition they tried to amend by

20   pleading in their opposition, which of course they're not

21   allowed to do.  But for risk disclosures, right, where you

22   warn a risk might happen and then it does happen, in order to

23   say that's false, you have to show that it had already

24   materialized or, as you say, is substantially certain.

25            THE COURT:  Either one of those?

32

1        MR. CLUBOK:  Either one of those would be fine.

2        THE COURT:  Okay.

3        MR. CLUBOK:  But the notion that it was

4   substantially certain in September of 2020 that there would be

5   a design defect that would cause Peloton to recall its

6   treadmills is ridiculous.

7        THE COURT:  Well, which is the last statement that

8   was filed that would have this kind of statement?

9        MR. CLUBOK:  So the very last statement is February

10  of 2021.

11       THE COURT:  Okay.

12       MR. CLUBOK:  And what's interesting about that

13  though, Your Honor, is by then Peloton had changed its

14  disclosures.  And Peloton there doesn't just say recalls could

15  occur; they say recalls have occurred and could occur.

16  Because there had been --

17       THE COURT:  But they are talking about bike pedals

18  there.  They are not talking about --

19       MR. CLUBOK:  That's right.  Bike pedals is something

20  different, but they basically said we've had recalls and they

21  could occur.

22       I hate to keep bringing up *Chipotle,* but Chipotle

23  said:  We have had some outbreaks in this store and others

24  could occur.  And the plaintiff there said, oh, but others

25  were occurring in other stores.  And they said, basically,

33

1   yeah, you know, you don't have to catalogue every single one.

2          But in February of 2021 -- okay, let's look at the

3   complaint.  Let's look at the complaint.  Okay?  It's the

4   plaintiffs who issued a complaint.  What do they allege

5   specifically?  That Jill Woodworth or John Foley knew in

6   February of 2021.  Where does that -- where in the complaint

7   does it say Mr. Foley and Ms. Woodworth, when they signed that

8   statement which by then was saying, hey, we've had recalls,

9   there could be others, and by the way there could be a design

10  defect, where are the specific facts that show that they at

11  that time knew there was a design defect for the Tread Plus,

12  knew that a recall was substantially certain to occur, even

13  knew about that -- what later became 12 incidents by March?

14  In early February, there's no allegations of any of that and

15  it's just not enough to tag Ms. Woodworth and Mr. Foley for

16  securities fraud for signing those statements.

17          THE COURT:  Had they had any reported accidents

18  prior to that?

19          MR. CLUBOK:  The plaintiffs do not allege -- I don't

20  think the plaintiffs allege a single reported accident to

21  Ms. Woodworth or Mr. Foley.

22          THE COURT:  No, well, I meant was there anything

23  that had been reported to the company or on their public

24  website about accidents prior to February 5th of 2021?

25          MR. CLUBOK:  I believe there had been two that the

34

1   plaintiffs have in Exhibit A, grand total of two, that it's --

2   if you look at 52 and 54, I think those are the only two that

3   is alleged in Exhibit A that Peloton was -- but if you look at

4   it, you see 52, a 6-year-old boy was pulled under the Tread

5   Plus and experienced lacerations and bruises.  And 54 -- and

6   his parent notified Peloton shortly after the incident.  And

7   then paragraph 54, where it says the family notified Peloton

8   of the incident and then received an e-mail response advising

9   the warnings.

10          Okay.  To say --

11          THE COURT:  Was Peloton sued as a result of that?

12          MR. CLUBOK:  Not until much later.  Not at that

13   time.  There was no lawsuits at that time.

14          And so this is it.  Okay?  These --

15          THE COURT:  Well, if someone has reported to them

16   that my child has gotten injured on the treadmill, would that

17   make it substantially certain that a lawsuit would be coming

18   down the pike?

19          MR. CLUBOK:  Substantially certain a lawsuit was

20   coming down the pike?

21          THE COURT:  Well, one of the things they talk about

22   is the risk of litigation.  So they know on February 5th, 2021

23   that let's say two accidents, one of which is a child who was

24   hurt, would that make it substantially certain that they would

25   be facing a lawsuit, one of the risks?

35

1          MR. CLUBOK:  Well, you could theoretically allege

2     it, I suppose.  But what you have to allege is the lawsuits

3     were -- first of all, not really because oftentimes companies

4     works things out.  Like, something like that happens, there's

5     often not lawsuits, right?  Often, in incidents like that, you

6     work it out.

7          And here, apparently, they had reached out to

8     Peloton.  Peloton -- it's not clear what was said.  There's

9     zeros allegations it ever made its way to Mr. Foley or

10    Ms. Woodworth.  Okay?  There's zero allegations --

11         THE COURT:  That what made its way?

12         MR. CLUBOK:  That -- these two reports.  It says his

13    parent notified Peloton.  Like, I suppose called customer

14    service, maybe called the place where they bought the Peloton.

15         THE COURT:  That was an event reported to Peloton,

16    correct?

17         MR. CLUBOK:  To Peloton.  But not to Ms. --

18         THE COURT:  Well, there is also allegations that any

19    time something like this happened, that it always went up the

20    chain and the big guys would have known.

21         MR. CLUBOK:  There are general, very general

22    allegations.  And they cite to a statement that was made, you

23    know, two years earlier, which they say was two months

24    earlier.  But if you look through the records, it was two

25    years earlier.

36

1          THE COURT:  Well, things generally do not change,

2     you know, suddenly.  If you have a policy of notifying the top

3     executives of adverse incidents with the --

4          MR. CLUBOK:  But, Your Honor, if you sell treadmills

5     and you had two reports that children who weren't supposed to

6     be on their treadmills, which you warned over and over again

7     they're not, that they got on there and they were hurt, I

8     think you would think it was terrible, you would feel sorry

9     for the parents, but you wouldn't think that's going to cause

10    a material risk to the company such that to commit intentional

11    securities fraud to not mention it.  It's not close.  It's not

12    even close to the cases that other Courts have dismissed where

13    they say it's got to be way more specific than that.  It's got

14    to be really tied to specific individuals and what they knew

15    and allegedly knew.

16          And by the way, plaintiffs do allege supposedly

17    statements were repeated, right, to executives.  And they have

18    these two confidential witnesses and the confidential

19    witnesses say:  I was in a meeting and in that meeting I heard

20    -- somebody else was in the meeting and they supposedly said

21    that some executives learned about incidents.  Doesn't say

22    who, what, where, when.  They had access to these confidential

23    witnesses.  If anything, it's shocking that those confidential

24    witnesses didn't say:  And I know that Mr. Foley heard this or

25    I know that it was all reported around the company or I saw it

37

1    in the newsletter that went around or anything like that.

2    Instead, they just give super general allegations that say,

3    you know, sometimes I was in a meeting and I heard some

4    executive sometimes heard about product issues.

5            Those allegations don't help the plaintiffs.  They

6    show -- given that they had access to those two confidential

7    sources, that just shows that there is no specific allegations

8    against Ms. Foley and -- or, I'm sorry, Mr. Foley and

9    Ms. Woodworth that are sufficient to subject them to

10   securities fraud for the Qs that they signed when the warnings

11   are all that there could be injuries.

12           At most, the plaintiffs say somewhere in the company

13   at that time, the third one, it was known that two kids had

14   fallen and kind of hurt themselves mildly.  You know, you

15   don't want any child to be hurt at all, but they were hurt.

16   And, you know, that doesn't mean that the company is going to

17   suffer the kind of recall that ultimately happens.  And the

18   plaintiffs don't allege that at the time Mr. Foley thought

19   there would be a recall or Ms. Woodworth thought there would

20   be a recall or that anyone --

21           THE COURT:  Well, it is not just recall; it is risk

22   of litigation, right?

23           MR. CLUBOK:  But it has to be material.  It can't be

24   two -- if that's all that had ever happened, was those two

25   folks had sued and they settled, it clearly wouldn't be

Andronikh M. Barna, Official Court Reporter, RPR, CRR

38

1   material to a company like Peloton.  That would be sort of the

2   cost of doing business when you sell treadmills because

3   children all the time on treadmills fall and get injured and

4   sometimes the parents sue.  And that's something that anyone

5   who invests in a company that sells products knows.

6            But Chipotle -- I'm sorry, I keep saying Chipotle.

7            Peloton specifically warned its users.  And it's,

8   again, darned if they do, darned if they don't.  Any

9   reasonable investor knows these kinds of accidents could

10  happen.  Peloton, though, made very specific warnings they

11  could happen.  The best plaintiffs have are very vague

12  allegations, the grand total of two incidents had been, quote,

13  reported to Peloton involving children by that time.  Not to

14  Mr. Foley or Ms. Woodworth and not that they were -- had risen

15  at that time to a level of materiality that they thought that

16  could have a serious impact on the company.  That's not

17  sufficient.

18           By March, April, May, you know, and certainly after

19  March, when Peloton invited users to come forward, that's when

20  they really starting getting specific knowledge.  And that,

21  the plaintiffs acknowledge that in their complaint.  And what

22  they just want to do is move you back in the clock and they

23  just want to -- they want you to be thinking about all this

24  stuff later.  It's fraud by hindsight, Your Honor.  This --

25           THE COURT:  Okay.  I do not want to cut you off, but

39

1    I do want to move along.

2           MR. CLUBOK:  I appreciate that.

3           It's fraud by hindsight, is what they're talking

4    about here.

5           And so, you know, the remaining statements are, as

6    you see on page 13, you know, nonactionable puffery and, you

7    know, again the kind of statements that don't rise to

8    securities fraud.

9           We do ask that Your Honor go through each of the

10   statements, match them up to who knew what when and at the

11   same time, for each individual speaker, not just broad brush,

12   everyone with every statement, as we -- and on page 18, see

13   whether or not the plaintiffs have alleged a strong inference

14   of scienter.  And if they can't allege a motive, they have to

15   have really strong circumstantial evidence that -- like, where

16   Ms. Woodworth and Mr. Foley, like, is there strong

17   circumstantial evidence that they were intentionally trying to

18   commit securities fraud in early February of 2021 because

19   somewhere it had been reported to the company that two

20   children had gotten hurt while running on treadmills against

21   the instructions of the company?  They wouldn't have a motive

22   to do this.  They didn't have a motive.  They certainly aren't

23   alleged to know anything about those specific incidents.  It

24   doesn't allege that the confidential witnesses who could have

25   said, hey, back then I knew everyone, including Ms. Woodworth

40

1    and Mr. Foley, knew about this stuff.  They clearly don't say

2    that.  And it -- just the function of their jobs does not

3    support scienter, does not support that kind of strong

4    inference that the Supreme Court and the PSLRA require.

5            THE COURT:  All right.  Thank you, Counsel.

6            MR. CLUBOK:  Thank you so much for your patience,

7    Your Honor.

8            THE COURT:  Okay.  Mr. Wilson.

9            Let me just begin by asking.

10           Mr. Wilson, do you agree that the allegations in the

11   complaint do not make out securities fraud with respect to the

12   Tread screen?  You know, not the Tread Plus, but the Tread.

13           MR. WILSON:  The monitor?

14           THE COURT:  Yes, the monitor.

15           Because do you allege anywhere that it malfunctioned

16   prior to March 9th of 2021?

17           MR. WILSON:  Your Honor, we do not have the kind of

18   statements with the Tread that we do for the Tread Plus, I

19   agree with that.  But we still think we have a securities

20   fraud case regarding the Tread and the monitor based on the

21   information that came out with the recall, just the sheer

22   number of incidents that were going on.

23           THE COURT:  Well, but what?  I mean, the statements

24   that you talk about after March 9th of 2021 that you say are

25   actionable, they all relate to the Tread Plus, they do not

41

1   relate directly to the Tread.  So where do we get a case?  Or

2   do you have a case with respect --

3              MR. WILSON:  Because these are --

4              THE COURT:  Let me finish my question.

5              -- with respect to the Tread screen.

6              MR. WILSON:  Your Honor, this is an omissions case.

7   I'll say, this is -- this is -- and what -- and even though

8   there are statements that have truth, there are truth, it's

9   truth in them.  When you buy a house and you represent that it

10  has a new paint job and all sorts of new features and

11  everything, if you don't disclose -- and those are all true,

12  but if you don't disclose that there was a flood a year ago --

13             THE COURT:  All right.  After you first learned of

14  the fact that the screens are falling off, what statements

15  after that are actionable as false because the screens fell

16  off?

17             MR. WILSON:  I would say the --  oh, March.  The

18  March 18th statement, the April 17th, the April 18th

19  statement.  Those are all issued by the company, signed.  Both

20  signed.

21             THE COURT:  Wait.  Hold on.

22             The March 18th statement refers to the Tread Plus,

23  right?

24             MR. WILSON:  It does.  Yes, I agree it does.

25             But they're talking about incidents with respect to

42

1    their equipment.  If -- it's focusing on the Tread Plus.  But

2    it also references that the CPSC is involved, which ultimately

3    led to the recall of both products.  And we submit that there

4    is a duty to disclose these incidents that are causing

5    injuries to people.

6            THE COURT:  Well, there is no general -- I mean, if

7    you want to have to make out a security case, you have to

8    point to a statement and state that the statement is false or

9    that something was omitted that makes the statement false.

10   But assuming the company had never said anything about their

11   products at all, there were just no statements but they had

12   this problem and they did not come forward and tell the

13   problem, that would just be a pure omission.

14           Is that actionable as securities fraud, a pure

15   omission?

16           MR. WILSON:  You mean without making any statements?

17           THE COURT:  Right.

18           MR. WILSON:  Oh, yes, absolutely.  I think so.

19           This is information regarding defects with the

20   product that would be material to investors to know.  And

21   we're talking about the risk of --

22           THE COURT:  So you are saying quite apart from

23   anything that they said, they had a duty -- assuming they had

24   said nothing, they had a duty to come forward and put in their

25   filings or make a public statement that the screen had fallen

43

1   off the Tread?

2          MR. WILSON:  Okay, we don't have the evidence in

3   terms of the timing and the volume of the monitors themselves,

4   Your Honor.  So one isolated incident, I agree, probably not.

5   Okay?  But we're talking about over a hundred incidents that

6   ultimately led to the --

7          THE COURT:  And during the class period?

8          MR. WILSON:  Well, Your Honor, the Tread launched in

9   2020, so yes, these are all during the class period.

10          THE COURT:  When do you show that the screens are

11   falling off for the first time, the first complaint of that?

12          MR. WILSON:  Yes, Your Honor, I agree.  The

13   allegation is that, the one incident in March for the Tread

14   and the monitor.

15          THE COURT:  So how do you have a claim with regard

16   to the Tread screens?

17          MR. WILSON:  Your Honor, our allegation is that with

18   the accumulation of incidents that were being reported to

19   Peloton regarding the monitor during the class period, it's

20   reasonable and plausible to infer these were happening during

21   the class period based on the launch of the Tread and based on

22   the information that ultimately came out.  And as acknowledged

23   by Peloton, over a hundred monitors, many of which caused

24   injuries, that they had a duty to disclose the risk to users,

25   to investors that this was an issue with respect to this great

44

1   new product.  Remember, they were touting this product as a

2   great new launch.  So when we're measuring all the context and

3   the magnitude of the consequences of these statements and the

4   omissions, in our view this absolutely is a --

5           THE COURT:  Well, what statement do you point to as

6   an omission where they should have said when they made X

7   statement, by the way you should know that this screen has

8   been falling off the Tread?  Which statements are you saying?

9           MR. WILSON:  In all of their SEC filings during the

10  class period.

11          THE COURT:  But no, the SEC filings are all before

12  anybody knew that the screen was falling off the Tread.

13          MR. WILSON:  We're saying it is reasonable to infer

14  that they didn't have 107 monitors fall between March and May

15  of 2021.

16          THE COURT:  What evidence do you have?  I mean, what

17  do you rely on for the inference that any of this happened

18  before March 9th of --

19          MR. WILSON:  Your Honor.

20          THE COURT:  -- or February 5th, which is the last

21  filing?

22          MR. WILSON:  We have the recall on the Tread.

23          THE COURT:  You have what?

24          MR. WILSON:  Just the announcement of the recall,

25  Your Honor.

45

1          THE COURT:  When did the Tread even come on the

2    market?

3          MR. WILSON:  December of 2020.  So that's a few

4    months after the start --

5          THE COURT:  So for sure it is not the November 6th

6    filing.  That is not a problem.

7          MR. WILSON:  Correct.

8          It's paragraph 64 onward of the complaint, starting

9    with February 5th...

10          THE COURT REPORTER:  I'm sorry, Counsel.

11          THE COURT:  She cannot hear you.

12          MR. WILSON:  Oh, I'm sorry.

13          It's beginning paragraph 64, I believe, which is the

14    quarterly, February 5th, 2021.

15          The February 24, 2021 presentation.  And in this one

16    they're talking about the UK and Canada and the new Tread

17    right there.

18          THE COURT:  Where?  What statement is that?

19          MR. WILSON:  Paragraph 66 of the complaint.

20    February 24th, 2021.  Defendant Woodworth.

21          THE COURT:  I'm sorry, let me just get the

22    complaint.

23          MR. WILSON:  I'm sorry if I'm going too fast.

24          THE COURT:  No, I just want the complaint.

25          What paragraph?

46

1          MR. WILSON:  66.

2          Talking about the new Tread.

3          THE COURT:  Well, what is your point about that?  Is

4     that a false statement?

5          MR. WILSON:  By omission, yes.

6          THE COURT:  You just really have -- are only

7     speculating that there had been some accident with the screen

8     before then, right?

9          MR. WILSON:  Well, I would respectfully suggest it's

10    a reasonable inference.  It's a plausible inference that these

11    defects were there with the new Tread when they launched them.

12    We're talking about, Your Honor, a pretty short class period.

13         THE COURT:  I mean, apart from whether there had

14    been an accident or not, it says:  In terms of mix, it has

15    been really, first of all, terrific to see the response in the

16    UK and now Canada with our new Tread.  And the reception and

17    reviews have been phenomenal.

18         MR. WILSON:  Mm-hm.

19         THE COURT:  Why is that false?

20         MR. WILSON:  It's false because they're talking

21    about the Tread, they're not disclosing a defect, significant

22    material defect in the product that any reasonable investor --

23    this is not something that we were talking about, you know,

24    with *Chipotle* and things that investors would know.  The

25    *Resnik* case, Your Honor is familiar with also, the valuation

47

1   of preexercise options, investors should know about that.

2   Investors should know about the Chipotle.  What investor is

3   going to know on notice that the monitors are going to be

4   falling off of your brand new product, Your Honor?  And so

5   this is a half-truth in our view.  You know, if you're going

6   to talk about how great these products are and so that the

7   investors are relying on these statements in buying stock and

8   if you're not going to tell people that you have this problem

9   with this Tread, the monitor, as well as the other, the Tread

10  Plus, that is an omission.  That is a materially -- that is a

11  false and misleading statement.

12          And, Your Honor, just to address an issue we were

13  talking about earlier.  It doesn't have to be intent.  It is

14  recklessness.  And there doesn't have to be motive, absolutely

15  not.  It is severe recklessness that's involved here.

16          THE COURT:  I understand that.

17          MR. WILSON:  Okay.  And I did want to -- unless the

18  Court has any...

19          THE COURT:  No, go ahead.  I'm sorry.

20          MR. WILSON:  I just wanted to talk a little bit

21  about the documents that are being relied on and referred to

22  by defense counsel with respect to Mr. Olson's statement and

23  some of the other documents.  We do not -- we're not picking

24  and choosing the statements from these documents to hide

25  anything.  We think the context is extremely important.

1      THE COURT:  Is this the only statement, the CNN
2  statement, that you have with regard to Mr. Olson?
3      MR. WILSON:  Yes, Your Honor.  That's the only
4  statement we have with Mr. Olson that we say is falsely
5  misleading.  But one statement, one false misleading statement
6  is actionable for a securities claim.
7      THE COURT:  Well, if he in context is talking about
8  COVID, you cannot take a statement out of context and then
9  argue that it is misleading because by the way we really don't
10 take our members' safety that seriously because forget about
11 COVID, you know, we have got these machines that are seriously
12 dangerous.
13     MR. WILSON:  You're right.  You're right,
14 Your Honor.
15     THE COURT:  Yes.
16     MR. WILSON:  And okay.  But you know what?  He can
17 move for summary judgment on that because what defense counsel
18 is talking about is a factual issue.  He has just offered his
19 opinion on what his interpretation --
20     THE COURT:  Well, do you agree that I can look at
21 the entire article and should be able to look at the entire
22 article?  Do you agree with that?
23     MR. WILSON:  I agree with that.
24     But what we disagree with -- and we submit all of
25 the documents should be, can be considered by the Court.  We

49

1    object to the ancillary documents that are not part of the

2    complaint and we don't think under -- even under the already

3    in kind of cases, that the substance of this document should

4    be accepted for the truth of the matter, including defense

5    counsel's interpretation of what he meant.  He doesn't know

6    what he meant.  The context -- we'll take his deposition and

7    we'll ask him what he meant and if that's the explanation then

8    we can go from there.  But our allegation is that this

9    supports an inference that he was reckless and he made this

10   statement about the safety of the product and he had a duty

11   to --

12              THE COURT:  Well, he did not make a statement about

13   the safety the product.  Isn't the only statement that you

14   are arguing about, "We obviously take our members' safety

15   seriously," that was not at least in any direct relationship

16   to a product, was it?  In this article they are not talking

17   about the Tread or the Tread Plus or the bike or the pedal or

18   anything else.

19              MR. WILSON:  That's true, Your Honor.  I agree with

20   that.

21              THE COURT:  By the way, wouldn't "We obviously take

22   our members' safety seriously" be sort of a puffery type claim

23   in any event?

24              MR. WILSON:  Sure.  But we take the statements --

25   the context, the source, and the magnitude of the statement.

50

1  And the date was April 30th, days before the recall.  Okay?

2          And just to sort of --

3          THE COURT:  Well, if it is days before the recall,

4  why doesn't that take away from your argument because he says

5  "We take our members' safety seriously," knowing that in a

6  couple of days they are going to recall this thing?

7          MR. WILSON:  Because they didn't disclose the extent

8  of the risk.  People are still buying the product, people are

9  still investing in the company, and people still don't know

10 that there is -- the issue with the Tread Plus is something,

11 again, like *Chipotle* and *Resnik*.  Nobody knew, nobody can

12 possibly know, except the defendants and then the CPSC, that

13 the risk was that this tank tread, these slats that were

14 unprotected, no guards, were sucking objects and human beings

15 underneath them and ultimately killed a child.

16         And also, Your Honor, just to -- if I could just --

17         THE COURT:  Let me ask you another question.

18         Assuming that you read your booklet and followed the

19 warnings, these accidents would not have happened; do you

20 agree with that statement?

21         MR. WILSON:  No, I do not.  I do not.

22         THE COURT:  Okay.  Tell me why not.

23         MR. WILSON:  Because they didn't warn people about

24 the risk that the Tread would continue to roll and would suck

25 you underneath it and cause serious bodily injury.  That was

51

1   not disclosed.  These generic boilerplate risk statements in

2   their SEC filings said nothing about that.  In fact,

3   Your Honor, if you look at the risk disclosures, they don't

4   even distinguish between the risks of the bike and the Tread.

5   It's just there's a risk and we might get sued.

6              THE COURT:  Don't they say about keeping objects

7   away from it and keeping children away from it?

8              MR. WILSON:  Well, that could mean anything,

9   Your Honor.  That could mean -- that doesn't give anybody a

10  reason to know or be aware that -- I mean, that could be like

11  a trip and bump their head.  Okay?  Not that they're going to

12  get physically sucked underneath it and have burns and broken

13  limbs and anything like that.  None of that was disclosed,

14  Your Honor.  That's what we're saying.  And that is absolutely

15  material to an investor to know that that's the risk.  And so

16  to sort of lump your risk disclosure statement without

17  distinguishing between the bike that had -- the bike had no

18  such risk, you know.  And then yeah, and they said keep your

19  kids away from the bike for all sorts of reasons, right?  But

20  they don't say anything about a specific risk of the Tread

21  Plus.  That's the issue.

22             And, Your Honor, so, you know, interpreting what

23  Mr. Olson meant by his statement, we think that is not

24  appropriate for this motion.  Maybe later down the road.  But

25  you know, in fact, Judge McMahon said in the *Allergan* case,

52

1    whether, in fact, he is, you know, referring to something that

2    he is saying is not the issue for this motion.  It may be

3    ultimately true, but it's not an issue for this motion.

4              Your Honor, I just wanted to make sure I'm covering

5    everything here.

6              I wanted to hand up one of the CPSC reports that we

7    cite.

8              THE COURT:  Cited in your complaint?

9              MR. WILSON:  Yes, Your Honor.

10             And this is Event No. 77.  I think this is correct.

11             THE COURT:  Excuse me just a second, Counsel.

12             (Pause in proceedings.)

13             I'm sorry.  Go ahead.

14             MR. WILSON:  Can I hand it to defense counsel?

15             THE COURT:  Oh, sure.

16             MR. WILSON:  Am I allowed to go there?

17             THE COURT:  Yes.

18             MR. WILSON:  We were talking about the --

19             THE COURT:  This is something that is referred to in

20   your complaint?

21             MR. WILSON:  Yes, Your Honor.

22             THE COURT:  And what is it?

23             MR. WILSON:  It's in our appendix where we

24   Document 107 some-odd incidents, serious incidents with the

25   Tread Plus that we gathered through the Facebook, closed

53

1    Facebook group.

2          THE COURT:  Which Facebook?  Is this the company's

3    Facebook site?

4          MR. WILSON:  You know, Your Honor, it's not the

5    company's.

6          As we allege, we describe it and Mr. Olson described

7    it -- first of all, Mr. Olson made three interviews.  It's not

8    just one.  He gave three interviews; two visual presentations,

9    one audio podcast where he goes into great detail.  And we

10   allege this in our complaint about how they monitored the

11   data, they mine the data, it's put in a report.  They use this

12   data to get to the root cause of issues and it's distributed

13   to everybody.  So, you know, in terms of scienter and

14   knowledge --

15         THE COURT:  But not that just somebody on their --

16   from what I understand, and correct me if I am wrong about

17   this, a group of users set up their own website, a couple of

18   people.  And is that where this document came from, the

19   website that --

20         MR. WILSON:  Oh.  Oh, no.  No.  The one I just

21   handed up?

22         THE COURT:  Yes.

23         MR. WILSON:  No, Your Honor.  I'm sorry.

24         Let me -- with this document I just wanted to

25   address, we were talking about the issue of the falsity and

54

1   the misleading nature of the March 18th statement, okay, And

2   the handful of incidents.

3           THE COURT:  Right.

4           MR. WILSON:  And by the way, I keep digressing, but

5   I just want to say by my count it's actually 11 incidents.

6           THE COURT:  Does that include the child who was

7   killed?

8           MR. WILSON:  No.

9           THE COURT:  Okay.

10          MR. WILSON:  No, Your Honor, this does not.

11          And by the start of the class period, I count five

12  children injuries.  Okay?

13          And then after the start of the class period,

14  September 11th, I have six children injuries that does not

15  include the death.  Okay?  But it does include this one that I

16  just handed up.  This is a CPSC report of -- this is the brain

17  injury.

18          THE COURT:  I know, but what is the date of this

19  report?

20          MR. WILSON:  Okay.  There's several dates involved

21  on these CPSC reports.

22          So the pertinent --

23          THE COURT:  Report date, 2/13/2021?

24          MR. WILSON:  Correct.  It was reported on 2/13/2021.

25  Okay?  And this is the brain injury child.  The child suffered

55

1    a serious brain injury.

2           Right underneath that:  Sent to the

3    manufacturer/importer/private labeler March 4th.

4           THE COURT:  Okay.

5           MR. WILSON:  March 4th.  So they knew about this

6    brain injury.

7           On March 18th, he did not say a word about this.

8    They didn't disclose the brain jury incident until a month

9    later, in April.  What would it take for them to finally

10   acknowledge the risk?  It took not just the brain injury, it

11   took a death, Your Honor.

12          THE COURT:  What was the date of the death?  I'm

13   sorry.  What was the date?

14          MR. WILSON:  Well, they announced it on March 18th.

15          THE COURT:  But you do not know when it occurred?

16          MR. WILSON:  We don't.  I don't think we have the

17   information.  They just announced it.  We don't see -- there's

18   nothing in -- obviously, you know, the Facebook posts, the

19   information, the publicly available information that we have

20   access to, we don't see that particular event.

21          But we did find this, and this is just further

22   evidence or support for our allegations regarding the

23   concealment.  And we argue it was a concealment, it was a

24   coverup.

25          THE COURT:  Well, this could have been one of the

56

1   handful of injuries, correct?

2         MR. WILSON:  Oh, my goodness, Your Honor, a handful

3   of injuries so downplays the magnitude of this and also casts

4   -- really, the blame and responsibility that underlies this

5   case is remarkable.  They're blaming the consumer for not

6   following their vague and ambiguous warnings.  That, to us, is

7   absurd that this defect -- and they're not telling anybody

8   about it, right?  Again, to reiterate that.  But they're

9   blaming the consumer for not following their warnings which

10  they don't tell anybody about.  They don't say keep --

11        THE COURT:  You are just saying the warnings had to

12  be more specific?

13        MR. WILSON:  Absolutely.

14        THE COURT:  That no one would think that if the

15  child walked behind a -- even though you tell them to keep

16  children away from the treadmill, that people should have

17  specifically been told?  The warnings are not sufficient?

18        MR. WILSON:  Exactly.

19        THE COURT:  But this is not a products liability

20  case.  This is an investor case.

21        MR. WILSON:  Right, right.  Right, the warnings were

22  insufficient.  They did not tell investors --

23        THE COURT:  So you are saying that their statement

24  that it is safe as long as you follow warnings, it is really

25  not accurate because the warnings do not accurately explain?

57

1          MR. WILSON:  Correct.

2          THE COURT:  Do you have that theory in your

3    complaint?

4          MR. WILSON:  Yes.  Yes, we do have that in our

5    complaint.  Yes.

6          I don't know, I'm not quite sure what new theory

7    defense counsel is referring to.  We're not adopting any new

8    theories.  We talk about the design defect of the Tread Plus,

9    the lack of guard and that there was no -- and that these risk

10   disclosure statements were false and misleading because they

11   don't disclose a specific risk involved here.

12         Now, I wanted to touch on a few other things.

13         THE COURT:  Okay.

14         MR. WILSON:  Unless the Court has specific questions

15   about these particular issues.

16         The other statements I believe that we're talking

17   about are the April, the April statements, which they

18   characterize -- you know, where they talk about

19   over-cooperating with the CPSC and they characterize those as

20   opinions or that they believed that they were cooperating and

21   language like that.  But if the Court looks at those

22   statements, there is nothing in there that talks about, you

23   know, we feel like we're right, we believe we're responding.

24   They flat out said, on April 17th and 18th, that the CPSC was

25   inaccurate, was issuing inaccurate information, false

58

1    information.  They challenge everything in the CPSC even

2    though, Your Honor, they knew about the March 4th brain injury

3    and all these other cases, these incidents, 11, right, before

4    March 18th, of serious injury to children.

5              And also, Your Honor, talking about the risk, the

6    risks involved, we submit that these risks are -- it's not

7    just a recall or litigation.  They say, in their risk

8    disclosures, the risk is risk of personal injury, you know,

9    risk that you can get harmed or property damage.  Those can

10   ultimately lead to more serious consequences, but they

11   specifically also refer to -- you know, to getting hurt.  But,

12   but even so, Your Honor, the federal regulations, the CPSC

13   mandates that if children are getting hurt, people are getting

14   hurt but especially children, you have to report these

15   incidents.  And we believe that they weren't doing that.  And

16   they didn't do that until the March 18th death and then they

17   announced, oh, we informed the CPSC that -- you know, about

18   this child dying and now there's going to be an investigation.

19   Well, I'm sure that if the CPSC had known about all these

20   injuries before, there would have been an investigation.  Or

21   at least it's reasonable to infer that there was the increased

22   risk, a substantial risk that they would have been

23   investigating Peloton and its products, because that's what

24   the regulations require them to do, is report these incidents.

25             If the Court allows me to -- let's see.

59

1                    (Pause in proceedings.)

2          THE COURT:  Counsel, I do not want to cut your

3    argument short.  I know your adversary had a lengthy time to

4    present their side.

5          MR. WILSON:  Yes, I know.  I appreciate that.

6          THE COURT:  I have a matter on.  I have a criminal

7    matter.  But could you, is it possible for you to wrap up what

8    you want to say?

9          MR. WILSON:  I think so, Your Honor.

10         THE COURT:  Okay.

11         MR. WILSON:  I'm just checking my notes to make sure

12   I covered everything.

13         THE COURT:  Okay.

14         MR. WILSON:  Yes.  I think, you know, just to

15   reiterate, we think this is one of the strongest pending cases

16   that we've come across based on the number of statements that

17   we have from Olson and the collection --

18         THE COURT:  From Olson?  That is just one statement.

19         MR. WILSON:  No, no, no.  I'm talking about the

20   three interviews that he gave.  This goes to scienter,

21   Your Honor, and recklessness.  The three interviews that

22   Mr. Olsen gave describing the corporate culture, their

23   involvement with the customers, they call them members,

24   collection of the data, that's --

25         THE COURT:  This is more than the CNN interview?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

60

1          MR. WILSON:  Your Honor, the CNN interview -- let me
2     -- I'm confusing you.
3          The CNN interview is a false, misleading statement
4     that we attribute to Mr. Olson.
5          THE COURT:  Right.  Okay.
6          MR. WILSON:  He was reckless that he didn't
7     disclose --
8          THE COURT:  Yes, I understand that.
9          I thought that was it with what you --
10         MR. WILSON:  That's it for false and misleading
11    statements.
12         What I'm referring to now is the allegations in
13    support of scienter, that the defendants are charged with
14    knowledge, intent or recklessness.  Based on our window into
15    the insight as to how the company operated, the collection of
16    data, including all of the incidents which we report in
17    Appendix A, Appendix A has all of the data that the defendants
18    knew about, including the four -- the five kids who were hurt
19    before the beginning of the class period, the additional six
20    that were hurt during the class period that they knew about,
21    we allege, and then the death and the additional injuries that
22    came in after they announced the death.  Yes, I agree.  If you
23    announce the death, people are going to start paying attention
24    and reporting accidents.  But even before that, Your Honor, we
25    had voluminous incidents that the defendants are charged with

61

1  knowledge under the standards of recklessness.

2        THE COURT:  Which amount to recklessness, according

3  to you?

4        MR. WILSON:  Yes, absolutely.

5        And, Your Honor, just to recap.  As Justice Ginsburg

6  said in *Tellabs*, for scienter it's a wholistic view.  Okay?

7  And even if some of your allegations of scienter are omissions

8  and are vague, we still consider them wholistically.  So, you

9  know, the --

10       THE COURT:  Well, a lot of vague allegations amount

11  to --

12       MR. WILSON:  No, no.  We totally -- our allegations

13  of consciousness behavior and recklessness are strong, but we

14  submit you can consider the other allegations, the stock

15  sales.  They were large, you know.  And that maybe alone, you

16  know, standing alone we don't have a motive, but under

17  *Tellabs* --

18       THE COURT:  So you agree that stock sales do not

19  establish motives standing alone?  You agree with that?

20       MR. WILSON:  I won't dispute that.

21       THE COURT:  Okay.

22       MR. WILSON:  But I still think the Court should

23  consider it and can consider it under Justice Ginsubrg's

24  specific direction in *Tellabs*, as well as the other scienter

25  allegations.

62

1           THE COURT:  Okay.  Thank you.

2           Counsel, you have a minute to tell me something that

3    you want to tell me in response.

4           MR. CLUBOK:  That's fair.

5           Your Honor, I'm just going to give you the --

6           THE COURT:  You do not need to repeat what you said

7    before.  Something new?

8           MR. CLUBOK:  No, I'm just going to leave with the

9    general principle that we hope Your Honor applies to this

10   case.  And that is, in a very rigorous way --

11          THE COURT:  Bad things happen?  Is that what you

12   are...

13          MR. CLUBOK:  No.

14          THE COURT:  No.  Okay.

15          MR. CLUBOK:  Look, I don't want to make light of it.

16   Obviously, it's horrible, right?  And Peloton came out and

17   disclosed it.

18          By the way, this document that he sent up to you, it

19   talks about how Peloton learned about March 4th, 2021 and

20   then, you know, two weeks later they're having their

21   statement.

22          But the point, Your Honor, I just want to leave you

23   with is the following.  We talked about the Tread.  We talked

24   about Mr. Olson.  We talked about specific instances where

25   it's clear they don't match up with who knew what when and the

63

1  specific scienter.  And we say for all the rest of the

2  allegations, you know, including some new ones I heard for the

3  very first time, like the warning label allegation, that's

4  certainly not in the complaint.  It would be an interesting

5  products liability case.  It's not in the securities

6  complaint.  We just ask that plaintiffs -- that the claims

7  that they clearly have not pled be dismissed.  And that for

8  the rest where they have not specifically said who knew what

9  when and made a temporal connection to an allegedly false

10  statement, that it also be dismissed with leave to replead and

11  maybe give them another chance.  We don't dispute that they

12  have another chance to try to get it more precise the second

13  go-around on some of those.  But even where they say there's

14  102 incidents known by May and they can't say who knew what in

15  February or March, that's just not sufficient under the

16  securities laws, under *Tellabs,* or any of the cases that talk

17  about not just a plausible inference but a strong inference.

18          THE COURT:  So what is it that they should be

19  permitted to replead, their scienter allegations or?

20          MR. CLUBOK:  I think at best what they should be

21  permitted to replead is when they say there's a -- here's

22  Exhibit A and there's a mishmash of confusing allegations

23  regarding what was known and when, they should have to say who

24  knew what when.  And if Your Honor wants to give them a second

25  go-around of that, we understand.  We're not -- what we want

64

1   to be dealing with here is a fair complaint that, with

2   specificity, puts us on notice.

3           And the worst thing that I heard my opposing counsel

4   say was, hey, look, so what, leave Mr. Olson in, we'll take a

5   deposition and we'll found out what he knows.  That's the

6   opposite of what's supposed to happen under the PSLRA.  It's

7   not we make a bunch of statements, we say a lot of things, and

8   hey, give us some discovery and we'll see what we find.

9   That's not fair to the individuals here.  It's not fair to the

10  company.  It's not what the PSLRA requires.  And the

11  plaintiffs simply just have to do more.

12          THE COURT:  Okay.  Let me just ask.

13          Thank you.

14          Are you making any application to replead the

15  complaint here, Counsel, or not?

16          MR. WILSON:  Yes.  It's in our -- it's in our

17  opposition brief.

18          THE COURT:  So you do want to replead?

19          MR. WILSON:  Well, we think we met the standard.

20          THE COURT:  But if not?

21          MR. WILSON:  If not, yes, we respectfully request

22  permission to replead to address any deficiencies that the

23  Court identified.

24          And the warning that he claims is brand new,

25  paragraph 7 of our complaint, we talk about warnings and

65

1    safety instructions.  It's throughout our complaint.

2              THE COURT:  Okay.  Thank you.

3              Thank you, gentlemen and ladies, for your argument.

4              Sorry I did not --

5              MR. CLUBOK:  Thank you so much for your patience.

6              THE COURT:  -- need judicial notice so your

7    colleague did not get, but all right, thank you.  Thank you,

8    all.

9              MR. CLUBOK:  Thank you so much, Your Honor.

10             MR. WILSON:  Thank you, Judge.

11             (Matter concluded.)

12

13                    *     *     *     *     *

14

15   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

16

17       /s/ Andronikh M. Barna              June 21, 2022

18         ANDRONIKH M. BARNA                 DATE

19

20

21

22

23

24

25

Andronikh M. Barna, Official Court Reporter, RPR, CRR